**Evelyn WILLIAMS, Plaintiff–Appellee,**

v.

**PHARMACIA, INC., a/k/a Pharmacia Ophthalmics, Inc., Defendant–Appellant.**

No. 96–4221.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1997.

Decided Feb. 26, 1998.

John C. Hamilton (argued), Doran, Blackmond, Ready, Hamilton & Williams, South Bend, IN, Tamara L. Renner, Banik & Renner, Elkhart, IN, for Plaintiff–Appellee.

Thomas J. Brunner, Jr. (argued), Paul J. Peralta, Kari A. Gallagher, Baker & Daniels, South Bend, IN, for Defendant–Appellant.

Before COFFEY, FLAUM, and DIANE P. WOOD, Circuit Judges.

FLAUM, Circuit Judge.

A jury found that Pharmacia, Inc. had discriminated against Evelyn Williams, a sales representative, on the basis of her sex when it refused to promote her and, later, fired her after she complained that the company paid men in her position more than it paid women. On appeal, Pharmacia argues that the district court should have entered judgment in its favor as a matter of law on Williams's Title VII claims. Pharmacia also challenges one of the district court's evidentiary rulings and the court's decision to award both front pay and Williams's lost future earnings as damages. We affirm.

## I. Background

Evelyn Williams began her career as a sales representative in Pharmacia's ophthalmic division in 1985. Pharmacia's primary business was manufacturing and distributing intraocular lenses, which are implanted into a cataract patient's eyes to improve vision, and "Healon," which is a substance that keeps a patient's eyes open during cataract surgery. Williams's sales territory consisted of parts of Illinois, Indiana, Michigan, and Ohio. Mike Baker, Pharmacia's regional sales manager for the Midwest territories, directly supervised Williams from 1987 to 1993. Baker answered in turn to Paul Lopez, who became the Vice President of Sales and Marketing in 1990.

Williams initially received strong performance reviews, and she had a good relationship with Baker. Her ratings started to slip, however, beginning with her January 1992

review. Baker testified at trial that although he had wanted to give Williams a two (on a scale ranging from a high of one to a low of seven), he ultimately gave her a three after Paul Lopez overruled him. Williams again received a two in each of her next two evaluations. In her July 1993 performance review, Williams rated only a four. Baker testified that, again, he had wanted to rate Williams higher but was overruled by Lopez. According to Baker, Lopez disliked Williams because she had complained about a company policy that imposed certain recordkeeping requirements on Pharmacia's sales force.

By this point, Baker's own relationship with Lopez had soured, and Baker began making plans to leave Pharmacia. Before he left, Baker recommended three people who, in his view, were best qualified to succeed him as the regional sales manager for the Midwest: Evelyn Williams and two men. Pharmacia interviewed the two men for the job, as well as four other men not recommended by Baker, but it did not interview Williams. At least one of the men who was interviewed had scored lower on his July 1993 evaluation than Williams had scored. In October 1993, Pharmacia selected Steve Wienecke, a former regional manager who had been serving as a national accounts manager, to fill Baker's position.

In late January 1994, Williams asked Pharmacia to adjust her base salary after learning from a sales representative in New York that her salary, which was $44,199, was below the average salary of $46,000 received by salespersons in similar positions. Pharmacia declined to adjust her salary and also informed Williams in February that, because of her declining performance ratings, she would not be receiving her regular merit increase in pay in 1994.

In March, Williams received her January 1994 performance review from her new supervisor, Steve Wienecke. Williams's rating had slipped lower than ever, down to a five. In addition, Wienecke also imposed on Williams a set of "interim objectives" regarding the level of sales she was expected to make in the coming months. The document conveying the interim objectives to Williams warned her that "[f]ailure to accomplish the

above objectives within the specified timeframes will result in further discipline up to and including possible termination."

A week after Williams received her January performance review, she filed a grievance through Pharmacia's internal grievance procedure to protest both the review and the decision not to adjust her salary. The grievance procedure consisted of a series of meetings, which proved unproductive, between Williams, Paul Lopez, and Pharmacia's vice-president in charge of personnel. Two months later, in May, Williams filed a grievance with the Equal Employment Opportunity Commission (EEOC). Concurrently, Williams struggled to meet the interim sales objectives that Wienecke had set for her. She failed to meet the objectives, which, according to Williams's expert witness, set unreasonably high expectations given the limitations of Williams's sales territory and the company's overall decline in sales. Pharmacia terminated Williams's employment in August 1994, citing her failure to meet the interim objectives. Williams brought suit against the company on August 17, 1994 and later added additional Title VII claims after receiving a "notice of the right to sue" from the EEOC in November.

Williams brought her suit under both Title VII and the Equal Pay Act. Count I alleged that Pharmacia violated the Equal Pay Act by paying Williams less than similarly situated male employees and by retaliating against her for filing a grievance challenging this salary differential. Counts II and III contained allegations under Title VII that Pharmacia had engaged in sex discrimination and unlawful retaliation against Williams by failing to promote her, retaliating against her because of her grievance, and terminating her employment. The jury rejected Williams's claims under the Equal Pay Act. However, the jury found in Williams's favor on the Title VII claims and awarded compensatory damages of $500,000, of which $250,000 were attributed to lost future earnings. The jury also awarded Williams $750,000 in punitive damages.

The district court vacated the punitive damages award and reduced the compensatory damages to $300,000, which is the statuto-

ry maximum under 42 U.S.C. § 1981a. The court also awarded equitable relief. The court ordered that Williams receive back pay in the amount of $180,000. Furthermore, although the court denied Williams's request for reinstatement because her position had subsequently been eliminated in a merger between Pharmacia and the Upjohn Company, the court gave Williams a front pay award of $115,530, which was equivalent to one year's wages and benefits.

On appeal, Pharmacia contends that the district court erred in failing to enter judgment as a matter of law in its favor. It also argues that the court committed reversible error by failing to exclude hearsay evidence that other women besides Williams felt that Paul Lopez had discriminated against them. Finally, Pharmacia claims that the front pay and lost future earnings awards should be vacated because they are not compensable under Title VII; in addition, the company argues that the two awards overlap and constitute double compensation. For the reasons that follow, we conclude that Pharmacia was not entitled to judgment as a matter of law; that the district court committed only harmless error in failing to exclude the hearsay testimony; and that the lost future earnings and front pay awards were appropriate.

## II. Discussion

### A. Judgment as a Matter of Law

We review the denial of a motion for judgment as a matter of law de novo. *Emmel v. Coca–Cola Bottling Co.*, 95 F.3d 627, 629 (7th Cir.1996). We limit our inquiry to "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir.1992). We will overturn a judgment for the plaintiff only if we conclude that "no rational jury could have found for the plaintiff." *Emmel*, 95 F.3d at 630. We apply this standard stringently in discrimination cases, where witness credibility is often crucial. Id.

Applying this standard to each of Williams's Title VII claims, we conclude that a rational jury could have found in Williams's favor based on the evidence presented at trial.

### 1. Failure to Promote

Williams's failure to promote claim arises under 42 U.S.C.2000e–2(a), which makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex". Williams was passed over for promotion to the regional sales manager position vacated by Mike Baker. Although Baker recommended that Pharmacia interview Williams and two male employees for the position, Pharmacia declined to offer Williams an interview. Pharmacia did, however, interview the two men recommended by Baker, as well as four other men. Williams presented evidence at trial that at least one of the candidates who was interviewed, Mark Altenburger, had received a lower score on his July 1993 evaluation than Williams had. She also presented evidence that she had more years of experience with the company than all but one of the interviewees. Finally, Williams presented evidence that no female salesperson had been promoted to management from a sales position during Williams's nine-year tenure with Pharmacia until after Williams filed her grievance with the company. Shortly after the grievance was filed, Pharmacia promoted Amy Haines to a management position even though she had only been with the company fourteen months and had significantly less sales experience than Williams.

As is often the case in employment discrimination suits, this evidence presents no "smoking gun" or direct evidence of sex discrimination. Taken together, however, we believe that a rational jury could rely on these facts to support an inference of discrimination. A rational jury could conclude from the comparison between Williams and the male candidates who were interviewed, as well as from the timing of the only promotion of a female salesperson to a management position, that Pharmacia discriminated against Williams because of her sex in failing to promote her.

### 2. Retaliation Claim

Title VII makes it unlawful for an employer to "discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the statute. 42 U.S.C. § 2000e–3(a). The record contains substantial evidence supporting a finding that Pharmacia retaliated against Williams for filing her grievance protesting the perceived pay differential between male and female sales personnel. The most significant evidence in this regard relates to the timing of Williams's grievance and the January 1994 performance review that imposed onerous and arguably unachievable interim sales objectives on her. Williams first complained of the pay differential in January 1994. She did not receive her January performance review-her worst yet—until March. This evidence, together with testimony that Williams compared favorably with male employees who did not receive bad reviews or onerous interim objectives, supports an inference that Pharmacia's decisions regarding Williams were motivated by a desire to retaliate against her because of her complaints about unequal pay.

### 3. Discriminatory Discharge

The evidence supporting the jury's verdict on Williams's discriminatory discharge claim under 42 U.S.C. § 2000e–2(a) largely tracks the evidence offered in support of her other Title VII claims. Williams was terminated in August 1994, ostensibly for failing to meet the interim objectives set for her as part of her January review. Williams presented evidence that she compared favorably to male employees who did not receive interim objectives, much less objectives coupled with an express threat of termination. The January review also required Williams to travel with her supervisor and to make detailed reports of her activities, burdens which were not imposed on male salespersons with similar ratings. In addition, Williams's expert witness testified that the objectives assigned to Williams were unrealistic and virtually impossible to achieve given the constraints of her sales territory and the company's overall decline in fortune during the relevant period. The jury could have credited this testimony and relied on it to support its conclusion that the objectives were unreasonable and, furthermore, that they served only as a pretext for terminating Williams's employment. This evidence, together with the comparisons drawn between Williams and similar male employees, could support a rational inference that Pharmacia fired Williams because of her sex.

"[W]e are particularly careful in employment discrimination cases to avoid supplanting our view of the credibility or weight of the evidence for that of both the jury (in its verdict) and the judge (in not interfering with the verdict). . . ." *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1054 (7th Cir.1990). Mindful of this fact, we conclude that the evidence sufficiently supports the jury's verdict on all three of Williams's Title VII claims. Accordingly, we affirm the district court's denial of Pharmacia's motion for judgment as a matter of law.

### B. Hearsay

Pharmacia also challenges the admission at trial of certain evidence relating to other women's experiences with the company. Williams and her former supervisor, Mike Baker, testified that five other women employed by Pharmacia had expressed dissatisfaction with the way that Pharmacia, and in particular Paul Lopez, was treating them. Lisa Bleisch told Williams that Lopez refused to assign her a different supervisor after she complained that her current supervisor was discriminating against her because of her sex. In addition, Baker testified that Bleisch told him that "Paul [Lopez]'s oppressive management style was too much for her and she just couldn't take it and she was going to get out." Sue Ponikar told Baker that she "just couldn't take reporting to Paul [Lopez] anymore, it was just too oppressive and she had to get out." Sue Marovic informed Baker that she believed Lopez "was trying to run her off" by making "unreasonable demands" on her. Kathy Kahn told Baker that she suspected Lopez was "out to

get her" and that this was the reason why Baker, who was on the same level as Kahn in the corporate structure, had been asked to supervise and evaluate her performance. Finally, Pat Hanlon complained to Williams about the low ratings she received from her supervisor and reported that, when she complained, the company's only response was to give her a new computer. Williams also introduced into evidence Hanlon's resignation letter in which she complained about discrimination and harassment by her supervisor and criticized Paul Lopez for failing to take any action. Williams introduced these out-of-court statements to demonstrate a pattern or practice of sex discrimination at the company.

■ The district court conducted an extensive hearing *in limine* to decide whether this evidence should be admitted. The court rejected Pharmacia's hearsay and relevancy objections, concluding that the evidence was admissible as a party admission under Rule 801(d)(2)(D). According to this rule, "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship".* Pharmacia argues on appeal that this evidence does not properly fall within Rule 801(d)(2)(D) and therefore should have been excluded as inadmissible hearsay. We review the district court's evidentiary rulings for abuse of discretion. *United States v. Zizzo*, 120 F.3d 1338, 1351 (7th Cir.), *cert. denied, Marcello v. United States*, —— U.S. ——, 118 S.Ct. 566, 139 L.Ed.2d 406 (1997).

In Pharmacia's view, an employee's statement regarding a particular action of the employer qualifies as a vicarious admission under Rule 801 only if the employee-declarant was involved in the decisionmaking process leading up to the employer's action. *See United States v. Rioux*, 97 F.3d 648, 661 (2d Cir.1996) (upholding admission under Rule 801(d)(2)(D) where the declarant was an "ad-

visor or other significant participant in the decisionmaking process that is the subject matter of the statement"); *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1094 (1st Cir. 1995) (upholding admission under Rule 801(d)(2)(D) where declarant "was directly involved in the reduction in force" leading to the plaintiff's termination); *see also Hill v. Spiegel*, 708 F.2d 233, 237 (6th Cir.1983) (holding that evidence was not admissible under Rule 801(d)(2)(D) where "there was no evidence that [the declarants] had any involvement in the decision to discharge [the plaintiff]"). The precise reach of Rule 801(d)(2)(D) is sometimes difficult to discern, as there has been considerable debate about the justification for classifying vicarious admissions as non-hearsay. See 4 WEINSTEIN'S EVIDENCE § 801(d)(2)(D)[01] at 801226 to 801–227 (Matthew Bender 1987); Freda F. Bein, *Parties' Admissions, Agents' Admissions: Hearsay Wolves in Sheep's Clothing*, 12 HOFSTRA L.REV. 393, 427–45 (1984). We are reluctant to follow Pharmacia's suggestion and read into the rule a generalized "personal involvement" requirement, especially in light of the Advisory Committee's admonition that "[t]he freedom which admissions have enjoyed ... from the restrictive influences of ... the rule requiring firsthand knowledge ... calls for generous treatment of this avenue to admissibility." FED.R.EVID. 801(d) advisory committee's note (2). However, in this case we agree that the evidence should have been excluded because the statements did not relate to matters within the scope of the declarants' agency or employment.

Although the complaints voiced by the five women described their unhappiness with their jobs and with their supervisors, not everything that relates to one's job falls within the scope of one's agency or employment. None of the women were agents of Pharmacia for the purpose of making managerial decisions affecting the terms and conditions of their own employment. These decisions were made by their superiors at the company. The evidence was introduced at trial to

---

* This rule was amended on December 1, 1997 by adding the following language: "The contents of the statement shall be considered but are not alone sufficient to establish ... the agency or employment relationship and scope thereof under subdivision (D)." 28 U.S.C.A. Federal Rule of Evidence 801 (West, WESTLAW through P.L. 105–153, 12/17/97).

support the plaintiff's theory of a pattern and practice of discriminatory decisionmaking, but there is no evidence that any of the five women were privy to or participated in Pharmacia's decisions affecting them. They were the subjects of those decisions; they did not make them. Although the women knew the outcomes of the managerial decisions at issue and the effects that those decisions had on them, the decisionmaking process itself—which is the relevant issue in proving a pattern or practice of discrimination-was outside the scope of the women's agency or employment.

■ Because the out-of-court statements concerned matters outside of the declarants' scope of employment, we conclude that the district court erred in allowing this testimony into evidence. This error was harmless, however, for it did not have "substantial and injurious effect or influence in determining the jury's verdict." *See Lemons v. Skidmore*, 985 F.2d 354, 359 (7th Cir.1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). Our discussion of Pharmacia's motion for judgment as a matter of law shows that there was sufficient evidence independent of the hearsay testimony upon which the jury could rely in finding Pharmacia liable for sex discrimination under each of Williams's Title VII claims. This evidence included the comparisons drawn between Williams and similarly situated male employees, the suspicious timing of the January 1994 review on the heels of Williams's complaint about discrepancies in pay, the timing of Pharmacia's promotion of a female salesperson to a managerial position shortly after Williams filed her grievance, and the evident impossibility of meeting the interim performance goals set for Williams as part of her January review. In light of the circumstantial evidence supporting Williams's claims, we do not believe that the hearsay evidence had an injurious effect on the verdict or otherwise unfairly prejudiced the outcome against Pharmacia.

### C. Damages and Equitable Relief

Williams received $300,000 from the jury in compensatory damages, of which $250,000 were attributed to lost future earnings. The district judge also ordered Pharmacia to pay Williams $115,530 in front pay, the equivalent of one year's wages and benefits, in lieu of reinstatement. Pharmacia raises three challenges to Williams's damage awards and equitable relief. First, Pharmacia argues that the district judge erred in awarding front pay, which Pharmacia claims is not within the judge's equitable powers under Title VII. Second, Pharmacia challenges the compensatory damages for lost future earnings, arguing that Title VII does not provide for such an award. Third, Pharmacia contends that the lost future earnings award and the front pay award overlap and therefore doubly compensate Williams for the same injury. We consider each of these contentions in turn.

#### 1. Front Pay

Under Title VII, the court is authorized "to order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g)(1). The district court awarded Williams one year's worth of front pay as a substitute for reinstatement, which was unavailable because a subsequent merger had eliminated the ophthalmic division in which Williams had worked.

■ We have never decided whether front pay may be awarded under Title VII. *See Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 678 (7th Cir.1993) (noting that availability of front pay under Title VII is an open question in the circuit). The district judge approached front pay as an equitable remedy, deciding it on his own rather than submitting it to the jury. We approve this course of action and join the other circuits that have held that front pay may be awarded under Title VII in cases where reinstatement is unavailable. *See, e.g., Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 n. 7 (2d Cir.1996); *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1002 (10th Cir.1996); *Weaver v. Casa Gallardo*, 922 F.2d 1515, 1528 (11th Cir.1991); *Shore v.*

*Federal Express Corp.*, 777 F.2d 1155, 1159 (6th Cir.1985).

■ Pharmacia argues that an award of front pay is outside the scope of the court's equitable powers under Title VII. It is true that front pay on occasion has been described in ways that suggest it is a legal remedy rather than an equitable one. For instance, in *Fortino v. Quasar Corporation*, 950 F.2d 389, 398 (7th Cir.1991), a case brought under the Age Discrimination in Employment Act, we analogized front pay to common-law damages for breach of an employment contract, which is a legal remedy. *Fortino* went on to reject this analogy, however, and to hold that front pay is an equitable remedy for which there is no right to a jury determination. *Id.* Front pay in the Title VII context is best understood as "a monetary award equal to the gain [the plaintiff] would have obtained if reinstated". *Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 332 (7th Cir.1993); *see also Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1232 (7th Cir.1995) (describing front pay as "a substitute for reinstatement"). Generally, front pay is awarded as a substitute remedy only when reinstatement is inappropriate, such as when "there [is] no position available or the employer-employee relationship [is] pervaded by hostility." *McNeil v. Economics Lab., Inc.*, 800 F.2d 111, 118 (7th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987), *overruled on other grounds*, *Coston v. Plitt Theatres, Inc.*, 860 F.2d 834, 836 (7th Cir. 1988).

Title VII explicitly authorizes reinstatement as an equitable remedy; front pay is the functional equivalent of reinstatement because it is a substitute remedy that affords the plaintiff the same benefit (or as close an approximation as possible) as the plaintiff would have received had she been reinstated. As the equivalent of reinstatement, front pay falls squarely within the statutory language authorizing "any other equitable relief." Thus, the district court did not err in awarding front pay after it concluded that Williams could not be reinstated to her old position.

### 2. Lost Future Earnings

■ The jury's award for lost future earnings is also appropriate under Title VII. The Civil Rights Act of 1991 added new remedial provisions to Title VII to authorize compensatory damages for a plaintiff's "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses". 42 U.S.C. § 1981a(b)(3). The district court characterized the jury's award for lost future earnings as "an intangible nonpecuniary loss." In doing so, the court analogized lost future earnings to an "injury to professional standing" and to "injury to character and reputation," both of which have been identified by the Equal Employment Opportunity Commission as examples of nonpecuniary losses compensable under the 1991 Act. Memorandum & Order of November 21, 1996 at 17 (citing *EEOC Policy Guidances on Damages Provisions of 1991 Civil Rights Act*, 8 FEPM 405:7091, 7095).

An award of lost future earnings is a common-law tort remedy. "To recover for lost earning capacity, a plaintiff must produce 'competent evidence suggesting that his injuries have narrowed the range of economic opportunities available to him.... [A] plaintiff must show that his injury has caused a diminution in his ability to earn a living.'" *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1370 (7th Cir.1992) (*McKnight III*) (quoting *Gorniak v. National R.R. Passenger Corp.*, 889 F.2d 481, 484 (3d Cir.1989)) (alteration in original), *cert. denied*, 507 U.S. 915, 113 S.Ct. 1270, 122 L.Ed.2d 665 (1993). Williams's expert witness testified that the poor evaluations Williams received and Pharmacia's eventual termination of her employment taint Williams's employment record. The jury was entitled to rely on this testimony in finding that Pharmacia's acts of discrimination diminish Williams's future earning capacity in the same way that a physical injury may diminish the earning capacity of a manual laborer.

We have noted previously that "the remedial scheme in Title VII is designed to make the plaintiff whole." *McKnight v. General Motors Corp.*, 908 F.2d 104, 116 (7th Cir. 1990) (*McKnight II*) (citing *Albemarle Paper*

*Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975)), *cert. denied,* 499 U.S. 919, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991). The broad compensatory remedies added to Title VII in the 1991 Civil Rights Act, which provide for damages for both "pecuniary" and "nonpecuniary" losses, are further evidence of this goal. When reputational injury caused by an employer's unlawful discrimination diminishes a plaintiff's future earnings capacity, she cannot be made whole without compensation for the lost future earnings she would have received absent the employer's unlawful activity. Lost future earning capacity is a nonpecuniary injury for which plaintiffs may be compensated under Title VII.

### 3. Overlap Between Front Pay and Lost Future Earnings

■■■■ Pharmacia argues that the front pay award and the lost future earnings award are duplicative and therefore overcompensatory. As we have explained, however, the two awards compensate the plaintiff for different injuries. Front pay in this case compensated Williams for the immediate effects of Pharmacia's unlawful termination of her employment. The front pay award approximated the benefit Williams would have received had she been able to return to her old job. The district court appropriately limited the duration of Williams's front pay award to one year because she would have lost her position by that time in any event because of the merger with Upjohn.

The lost future earnings award, in contrast, compensates Williams for a lifetime of diminished earnings resulting from the reputational harms she suffered as a result of Pharmacia's discrimination. Even if reinstatement had been feasible in this case, Williams would still have been entitled to compensation for her lost future earnings. As the district court explained:

> Reinstatement (and therefore front pay) ... does not and cannot erase that the victim of discrimination has been terminated by an employer, has sued that employer for discrimination, and the subsequent decrease in the employee's attractiveness to other employers into the future, leading to

further loss in time or level of experience. Reinstatement does not revise an employee's resume or erase all forward-looking aspects of the injury caused by the discriminatory conduct.

Memorandum & Order of November 21, 1996 at 22. A reinstated employee whose reputation and future prospects have been damaged may be effectively locked in to his or her current employer. Such an employee cannot change jobs readily to pursue higher wages and is more likely to remain unemployed if the current employer goes out of business or subsequently terminates the employee for legitimate reasons. These effects of discrimination diminish the employee's lifetime expected earnings. *See Gorniak v. National R.R. Passenger Corp.,* 889 F.2d 481, 484 (3d Cir.1989) (award of future lost earning capacity is appropriate when the plaintiff has "a decreased ability to weather adverse economic circumstances, such as a discharge or layoff, or to voluntarily leave the defendant employer for other employment."). Even if Williams had been able to return to her old job, the jury could find that Williams suffered injury to her future earning capacity even during her period of reinstatement. Thus, there is no overlap between the lost future earnings award and the front pay award.

Pharmacia argues that the conceptual distinction between front pay and reinstatement vanishes in light of our definition of front pay as "the discounted present value of the difference between the earnings [an employee] would have received in his old employment and the earnings he can be expected to receive in his present and future, and by hypothesis inferior, employment." *Downes v. Volkswagen of Am., Inc.* 41 F.3d 1132, 1141 n. 8 (7th Cir.19943) (quoting *McKnight II,* 908 F.2d at 116) (alteration in original). Pharmacia contends that, under this definition, front pay and lost future earnings are the same because each compares earnings from one's former position with expected future earnings.

We do not agree that this definition equates front pay with lost future earnings. Front pay gives the employee the earnings she would have received had she been rein-

stated to her old job. But since the employee has a duty to mitigate damages, she may have taken another job in the interim (or be expected to find another job soon). *See McNeil v. Economics Lab., Inc.,* 800 F.2d 111, 118 (7th Cir.1986) (acknowledging, in an age discrimination case, that "the duty to mitigate damages may limit the amount of front pay available"). Giving the employee the earnings from her old job without taking account of her earnings from her new (or expected) job would result in overcompensation. Thus, the front pay award gives the employee the present value of the earnings from her old job less the earnings from her new (or expected) job.

In determining earnings from the employee's new or expected job for the purposes of calculating front pay, the court terminates the inquiry at the point at which the plaintiff finds employment comparable or superior to her old job. Once the plaintiff finds such employment, the damages from her unlawful termination—at least, the damages that reinstatement/front pay are designed to remedy—are mitigated down to zero. This is the reason why front pay awards are limited in duration. *See, e.g., McKnight III,* 973 F.2d at 1372 (stating that "to provide the district court with the essential data necessary to calculate a reasonably certain front pay award," the plaintiff must show "the length of time the plaintiff expects to work for the defendant"); *Ward v. Tipton County Sheriff Dep't,* 937 F.Supp. 791, 796 (S.D.Ind.1996) ("Front pay is awarded for a reasonable period of time, until a date by which the plaintiff, using reasonable diligence, should have found comparable employment.") (citing *Hutchison v. Amateur Elec. Supply, Inc.,* 42 F.3d 1037, 1045 (7th. Cir.1994)); *see also Edwards v. Occidental Chem. Corp.,* 892 F.2d 1442, 1449 (9th Cir.1990) (holding, in a Title VII case where the plaintiff's promotion was unlawfully delayed because of the defendant's discrimination, that "[t]he district court's award of front pay beyond the date [the plaintiff] obtained the desired promotion must be vacated.").

■ Limiting the duration of front pay awards also helps to replicate the effects of reinstatement. Reinstated employees are not necessarily expected to stay in their positions indefinitely. Just as a reinstated employee may be expected to leave his or her position for comparable or better employment, an employee receiving front pay in lieu of reinstatement is entitled to front pay only until such time that the employee can reasonably be expected to have moved on to similar or superior employment.

■ Damages for lost future earnings, in contrast, are not limited in duration in the same way. The reputational or other injury that causes the diminution in expected earnings can stay with the employee indefinitely. Thus, the calculation of front pay differs significantly from the calculation of lost future earnings. Whereas front pay compensates the plaintiff for the lost earnings from her old job for as long as she may have been expected to hold it, a lost future earnings award compensates the plaintiff for the diminution in expected earnings in all of her future jobs for as long as the reputational or other injury may be expected to affect her prospects.

As a final note, although there is no overlap in this case, we caution lower courts to take care to separate the equitable remedy of front pay from the compensatory remedy of lost future earnings. On occasion, courts have awarded damages under the rubric of front pay that may be better described as lost future earnings. *See McKnight II,* 908 F.2d at 117 (noting front pay awards that are "realistically damages for lost future earnings"). Properly understood, the two types of damages compensate for different injuries and require the court to make different kinds of calculations and factual findings. District courts should be vigilant to ensure that their damage inquiries are appropriately cabined to protect against confusion and potential overcompensation of plaintiffs.

### III. Conclusion

For the reasons given above, we affirm the judgment of the district court.