In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 04-4270, 04-4331

CHARLES R. MATTENSON,

*Plaintiff-Appellee/Cross-Appellant*,

*v.*

BAXTER HEALTHCARE CORPORATION,

*Defendant-Appellant/Cross-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 3283—**John W. Darrah**, *Judge.*

ARGUED SEPTEMBER 9, 2005—DECIDED FEBRUARY 21, 2006

Before BAUER, POSNER, and WOOD, *Circuit Judges.*

POSNER, *Circuit Judge.* Mattenson, a patent lawyer, brought suit against his former employer, Baxter Healthcare, under the Age Discrimination in Employment Act. The jury found in Mattenson's favor and awarded him more than half a million dollars in back pay, which the judge then doubled, in accordance with the statute, because the jury had found that the violation of the ADEA was willful. But he refused to award front pay, precipitating Mattenson's cross-appeal.

Mattenson was 51 years old when he was fired in 2001 after having worked for Baxter for 14 years. In asking the jury to infer that he was fired because of his age, Mattenson emphasized that he was fired just 10 days before his early-retirement benefits would have vested; that he was replaced by a much younger man at a higher salary ($258,000 versus his salary of $240,000); that during his entire 14 years of employment by Baxter all his semi-annual performance evaluations (until the last, which was only a few months before his termination) had stated that he was meeting expectations; that his superiors had pretended that his termination was voluntary on his part and thus were unworthy of belief concerning the reason for his termination; and that three other employees of the division in which Mattenson worked (the Renal Division, which manufactures nondrug products for the treatment of kidney failure) had been fired in circumstances strongly suggestive of age discrimination. It is uncertain whether one of the three was actually employed by the Renal Division or merely worked closely with the division's employees, but nothing turns on the answer to that question.

Baxter's principal defense in the district court was that Mattenson had quit rather than having been fired. But the company mentioned a history of performance failures that would have justified firing him, culminating in his missing patent-filing deadlines in Japan and Brazil that resulted in the company's failing to obtain patent protection in those countries for one of its new products. Baxter attributed the failure to Mattenson's poor communication with his paralegals and with the company's scientists whose inventions he sought patents for. Had the jury believed the evidence, it would probably have concluded that, if he was fired (as the evidence strongly suggested), it was for doing a poor job rather than for be-

ing on the verge of obtaining vested early-retirement benefits or because of some generalized dislike of older employees.

Mattenson's principal tactic for persuading the jury not to credit the evidence of his deficient performance was to emphasize his unbroken stream of "meets expectations" evaluations until the last. Until then, his lawyer told the jury in opening argument, Mattenson "had received nothing but reviews that say meets expectations, meets expectations, meets expectations in every area all the time." "[M]eets expectations," the lawyer said, means that an employee "operate[s] at the highest level of their profession." These statements, and the testimony that Mattenson gave in support of them, were misleading. For in 1996 Mattenson had been placed on a "performance" plan because of problems of communication.

The district judge refused to allow Baxter to place the plan in evidence or make any reference to it. The judge's ground was that it was remote in time and different in grounds from Mattenson's termination. It was neither. The 1996 plan lists Mattenson's "developmental needs" as needing to avoid "derogatory, condescending or disrespectful behavior," "verbosity," and "not being careful or thoughtful in interacting with others." Under the heading of "desired results," the plan specifies that "communication will be perceived as clear and concise." The plan states that "failure to achieve and maintain the performance standards outlined above will lead to additional disciplinary action, up to and including immediate termination." Baxter contends that it was problems of communication with scientists and paralegals that resulted in the missed patent deadlines that led to subjecting Mattenson to the second performance plan.

The judge's error was compounded by the fact that Mattenson's termination was precipitated by his refusal to comply with the second plan. Baxter argued that it was that refusal, not anything to do with his age, that caused his termination; and a refusal to comply with the lawful order of one's employer is indeed not conduct protected by the age discrimination law. E.g., *Cengr v. Fusibond Piping Systems, Inc.*, 135 F.3d 445, 452 (7th Cir. 1998); *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1180 (7th Cir. 1997); *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 354 (5th Cir. 2005). Mattenson's riposte was that the purpose of the (second) performance plan "was to put him out the door, or, if he said he'd go along with them, to put him out the door in six months or three months." But when he was put on the plan, he had already been employed for five years after being put on a similar plan. Had Baxter been permitted to present the 1996 plan to the jury, the company's contention that Mattenson was fired for refusing to comply with the second plan would have been greatly strengthened. And since Mattenson successfully completed the 1996 plan, presenting it to the jury would also have undermined his claim that Baxter always fires employees it places on performance plans. The claim was important because, if true, it implied that Mattenson's failure to complete the second performance plan could not have been a factor in his being fired.

It was a close case; the judge's error entitles Baxter to a new trial. There were other errors as well, which should be corrected on remand. The judge on his own initiative gave a *McDonnell-Douglas* instruction despite tireless repetition by appellate courts that the burden-shifting formula of that case is not intended for the guidance of jurors; it is intended for the guidance of the judge when asked to resolve a case on summary judgment. E.g., *St. Mary's Honor Center v. Hicks*,

509 U.S. 502, 510-12 (1993); *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1350 (7th Cir. 1995); *Sanders v. New York City Human Resources Administration*, 361 F.3d 749, 758 (2d Cir. 2004); *Watson v. Southeastern Pennsylvania Transportation Authority*, 207 F.3d 207, 221 (3d Cir. 2000).

The judge compounded the error by instructing the jury that if Mattenson "has established each of the essential elements of his claim, then you will consider the defense alleged by Baxter Healthcare Corporation that the treatment of Charles Mattenson was for a *reasonable* factor other than age." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 979 (7th Cir. 2004); *Partington v. Broyhill Furniture Indus., Inc.*, 999 F.2d 269, 271 (7th Cir. 1993); *Keyes v. Secretary of Navy*, 853 F.2d 1016, 1026 (1st Cir. 1988); see *Smith v. City of Jackson*, 125 S. Ct. 1536, 1543-44 (2005) (plurality opinion). This was the equivalent of saying that Mattenson was a tenured employee who could therefore be fired only for cause; in fact he was an employee at will who could be fired for any reason not forbidden by the age discrimination law, such as failing to trim his mustache or eating with his fork in his left hand.

A related error was to instruct the jury that it "must determine whether or not [Mattenson's termination] is legitimate or only a pretext for age discrimination," the implication being that proof of pretext compels, rather than merely permits, an inference of discriminatory intent. The Supreme Court held in *St. Mary's Honor Center v. Hicks*, *supra*, that proof of pretext does not compel an inference of discriminatory intent. "[T]he real reasons behind an employer's action may be shameful or foolish, but unrelated to . . . discrimination, in which event there is no liability." *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 726 n. 9 (7th Cir. 2005); *Anderson v. Baxter Healthcare*

*Corp.,* 13 F.3d 1120, 1124 (7th Cir. 1994). After all, there are all sorts of bad reasons for an employment action besides discriminatory reasons, and an employer might want to conceal the bad but nondiscriminatory reason for its firing or taking other adverse action against the plaintiff, in order to avoid bad publicity.

Another trial error, this one relating to whether Mattenson quit because he didn't want to comply with the performance plan, or was fired, was the judge's failure to shield any part of the notes taken by Baxter's chief employment lawyer, Stephanie Bradley, from discovery and use at trial. The work-product doctrine shields materials that are prepared in anticipation of litigation from the opposing party, on the theory that the opponent shouldn't be allowed to take a free ride on the other party's research, or get the inside dope on that party's strategy, or (as attempted here) invite the jury to treat candid internal assessments of a party's legal vulnerabilities as admissions of guilt. *United States v. Nobles*, 422 U.S. 225, 236-38 (1975); *United States v. Frederick*, 182 F.3d 496, 500 (7th Cir. 1999).

Two of Mattenson's superiors, after deciding to put him on the (second) performance plan, met with lawyer Bradley, ostensibly to learn how to do this; that is implausible, and the jury was entitled to find that the real reason was to discuss the severance benefits to which Mattenson would be entitled if he ceased to be employed by Baxter. This was evidence that Mattenson's superiors foresaw that the performance plan was indeed merely a way station to termination, which, as we know, was one of the key issues. The meeting made Bradley's lawyer antennae wriggle. The notes say such things as "have other heads rolled for *losing patents*" (her emphasis); "do we still have currently employed patent lawyers who've lost a patent?";

"too cursory review [of a Japanese patent decision]"; "can't work as hard as these kids, I've had a heart attack"; "legal vulnerabilities: age 51, allege ADA [Americans with Disabilities Act]"; "likely to be gone at yr. end w/ $." The quoted language, a substantial fraction of the words on two pages of scattered handwritten notes, is work product: it is a lawyer's thoughts about a potential suit against the company, noting some of the strengths and weaknesses of the company's case. Bradley was thinking and writing about a possible case—a case that in fact materialized—and, provided the prospect of litigation was not remote (and it was not), the fact that the case hadn't begun and might never be brought did not disqualify her jottings from the shelter of the work-product doctrine. Fed. R. Civ. P. 26(b)(3); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 977 (7th Cir. 1996); compare *EEOC v. Lutheran Social Services*, 186 F.3d 959, 968 (D.C. Cir. 1999). It doesn't matter that Mattenson's two supervisors testified that the meeting was not in anticipation of litigation. That testimony was consistent with the meeting's having gotten into issues that the lawyer recognized as legal and opined on in the notes that she took at the meeting.

But that was not all that the notes contained. They also contained evidence that the company was anticipating that notwithstanding the performance plan, which Mattenson had not yet rejected, he would be terminated. Apart from the "likely to be gone at yr. end," the notes mention a "severance equivalent." This is not strong evidence that the performance plan was just a ploy to get rid of Mattenson, but it is some evidence, and it could have been presented to the jury by whiting out the portions of the notes that reflected Bradley's legal thinking. Rule 26(b)(3) of the civil rules distinguishes between materials "prepared [by one's opponent] in anticipation of litigation" that contain "the

mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation," and those that do not contain such impressions, conclusions, etc. The former are out of bounds, but the latter are discoverable "upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." See *Hickman v. Taylor*, 329 U.S. 495, 511-12 (1947); *In re Cendant Corp. Securities Litigation*, 343 F.3d 658, 663 (3d Cir. 2003). Mattenson has not made that showing, but should be allowed to do so on remand. What he should not be allowed to do is cross-examine lawyer Bradley about the company's "legal vulnerabilities." That cross-examination, irrelevant and highly prejudicial, should not have been permitted quite apart from the work-product doctrine. Fed. R. Evid. 403. Similarly, at the new trial Mattenson's lawyer must not be allowed to harp on Baxter's delay in responding to his discovery request for Bradley's notes, as he did at the first trial. The judge was too permissive with respect to the lawyer's use of innuendo to turn the jury against Baxter.

After initially expressing doubt that the notes contained work product, the judge rejected the application of the privilege on the ground of fraud. The privilege is indeed forfeited if the attorney is assisting his client to commit a crime or a fraud, *In re Grand Jury Proceedings*, 102 F.3d 748, 750-52 (4th Cir. 1996), but of course "a party seeking to invoke the crime-fraud exception must at least demonstrate that there is probable cause to believe that a crime or fraud has been attempted or committed and that the communications were in furtherance thereof." *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995). The judge did not explain clearly why he thought there was fraud here, but as best we can

reconstruct his cryptic explanation it is that the notes contain material that contradicted Baxter's defense; and this is the ground on which Mattenson defends the judge's ruling. Of course there was inconsistency—that is why Mattenson wanted to use the notes at trial. But if inconsistency between work product and other evidence were treated as proof of fraud, there would be no work-product privilege.

Baxter attacks two other types of evidence as prejudicial. The first is Mattenson's testimony that his termination inflicted emotional distress on him and his family. Ordinarily such testimony would be irrelevant, because, as we note later, the Age Discrimination in Employment Act does not authorize the award of common law damages. But Baxter opened the door to that testimony by its contention that Mattenson had quit voluntarily. He was entitled to testify that he would never have done that, because of the emotional as well as financial damage that leaving Baxter would have imposed (and did in fact impose); and that he quit only because by consenting to the performance plan he would have been making admissions of inadequate performance that Baxter could use against him after it fired him and he sued.

The other type of evidence that Baxter attacks as prejudicial is testimony concerning age discrimination against other employees of the Renal Division. Baxter points out that the alleged discrimination was by other supervisors, not by Mattenson's supervisors, that the division has 7,000 employees, that the evidence created trials within the trial, which could well have confused the jury, and that the evidence poisoned the jury by exposing it to "ageist" remarks by those other supervisors.

Within a period of 11 months centered on Baxter's placing Mattenson on the second performance plan in July 2001, the Renal Division fired three other long-term employees, ranging in age from 55 to 61, one of whom was verging on eligibility for a full pension. In the same period, a vice-president of Baxter told a meeting of executives (or so Mattenson claims, though no such quotations appear in the pages of the record that he cites for the claim, or anywhere else that we can find) that "we have too many old expensive people in the family area" and "we could get younger stronger and faster people that did not have the expense that went along with them, the family obligations and those types of things," and these remarks were echoed by other executives. One of the three employees who was fired told Baxter's vice-president of human resources about the comments at the meeting, and she, according to his testimony, agreed with the sentiments but said that the word "old" should not have been used. (The employee in question was entitled to testify to what she said, because it was an admission of the defendant's agent made within the scope of her employment. Baxter could have called her to the stand to give her own version of the conversation, but it did not.) Another of the three employees was told that he was being let go because his job was being eliminated; but within months of his departure the job was resurrected and filled by a 35-year-old.

These were not lawyers, and the executives who made the "ageist" comments were not in Mattenson's chain of command. A division of 7,000 employees in a high-tech firm like Baxter contains hundreds of executives, and the fact that some may dislike old workers and even fire old workers because of their age is weak evidence that a particular older employee was fired because of his age. Proof of a *pervasive* firm or divisional culture of prejudice against old

or female or minority workers is stronger evidence, however. E.g., *Emmel v. Coca-Cola Bottling Co.*, 95 F.3d 627, 632 (7th Cir. 1996); *Cummings v. Standard Register Co.*, 265 F.3d 56, 63 (1st Cir. 2001); *Ryther v. KARE 11*, 108 F.3d 832, 843-44 (8th Cir. 1997). "Pervasive" implies some likelihood that the plaintiff lost his job because of discrimination, though not a certainty, because even in a discriminatory workplace some employees are fired for reasons unrelated to their membership in a group that the employer discriminates against.

The evidence in this case, based on remarks made at just one meeting, fell so far short of proving a pervasive culture of discrimination that had the judge been concerned that the evidence would extend the trial unduly, or confuse or prejudice the jurors, he would have been within his rights to exclude the evidence under Rule 403 of the evidence rules. *Wyninger v. New Venture Gear, Inc.*, *supra*, 361 F.3d at 975; *Kline v. City of Kansas City*, 175 F.3d 660, 668 (8th Cir. 1999). That might well have been the better ruling. But bearing in mind the deference that appellate courts give to evidentiary rulings, we cannot say that he committed reversible error in allowing the evidence to be presented. One of the three fired employees testified that he was fired on the verge of being entitled to a full pension, which is what happened to Mattenson. And in this day and age, for executives at the vice-presidential level of a major business enterprise to be talking openly about the desirability of getting rid of old employees is at least some evidence of the discriminatory workplace culture of which we spoke. Cf. *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 92-93 (2d Cir. 2001); *Williams v. Raytheon Co.*, 220 F.3d 16, 20 (1st Cir. 2000); *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995). Not that testimony about a workplace "culture" as such is admissible; it is too vague. *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 360 (7th Cir.

2001). But testimony based on the personal knowledge of the testifying employees can provide a basis for an inference that discriminatory attitudes permeate a firm's employment policies and practices.

Language in some judicial opinions suggests that prejudicial remarks are always to be excluded unless they are made by someone who had input into the decision to terminate (or take other challenged adverse employment action against) the plaintiff. E.g., *Steger v. General Electric Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003); *Wyvill v. United Companies Life Ins. Co.*, 212 F.3d 296, 304 (5th Cir. 2000). This language should not be taken literally, however. *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1423 (7th Cir. 1986); *Brewer v. Quaker State Oil Refining Corp.*, *supra*, 72 F.3d at 333-34. The admissibility of "stray remarks," as the cases call them, is governed by Rule 403 of the evidence rules, which establishes a standard rather than a rule—and a standard that tilts in favor of admissibility; the probative value of the evidence must not merely be outweighed, it must be substantially outweighed, by its negative consequences, to be excludable. And that will depend on context—the circumstances in which the remarks were made, such as the number of similar remarks, when they were made, and by whom and to whom they were made. *Cummings v. Standard Register Co.*, *supra*, 265 F.3d at 63; *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356-57 (6th Cir. 1998).

It remains to consider the cross-appeal. An award of front pay compensates an unlawfully discharged employee for the loss of earnings that he sustains as a result of the discharge. *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001); *Fortino v. Quasar Co.*, 950 F.2d 389, 398 (7th Cir. 1991). The familiar common law duty of mitigating damages is imposed: the employee must make a diligent

search for comparable employment. *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 954 (7th Cir. 1998); *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1235-36 (7th Cir. 1986). Mattenson testified that he applied for jobs with all the companies and law firms that patent medical devices and none would give him a job. He therefore directed his economic expert to calculate front pay on the assumption that he will never earn another penny.

The judge, quite rightly in our view, thought this was wrong. (Front pay is an equitable, not a legal, remedy, so is decided by the judge, not the jury. The standard legal remedy of an award of lost future earnings, while indistinguishable as a practical matter from front pay, is not available in a suit under the ADEA. See *Commissioner v. Schleier*, 515 U.S. 323, 336 (1995); *Moskowitz v. Trustees of Purdue University*, 5 F.3d 279, 283 (7th Cir. 1993); compare *Williams v. Pharmacia, Inc.*, *supra*, 137 F.3d at 954 (lost future earnings may be awarded in a Title VII case).) Mattenson probably won't be able to find another job that pays him $240,000 a year. But he can't insist on Baxter's paying him that amount each year until he turns 65 (his intended retirement age) in order that he can play golf eight hours a day. Even if he can't find another job prosecuting patent applications for dialysis machines, or even another job as a patent lawyer in the medical-products industry—the largest and most lucrative field of patent activity today—he should be able to find a job in a law firm, or in a business firm involved in medical products, a field in which he has vast experience plus an educational background that includes a master's degree in biomedical engineering. He was required to present persuasive evidence of inability to find a substitute job; the fact that he contacted 23 firms without success does not satisfy that burden, given the range of opportunities open to someone with his back-

ground and experience. See *Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc.*, 399 F.3d 52, 67 (1st Cir. 2005).

As we have resolved the issue of front pay, there are no remedy issues (other than attorneys' fees, costs, and interest) for determination on remand. The retrial that we are ordering will therefore be limited to liability, except that, in the event Mattenson again prevails, whether he is entitled to double back pay will depend on whether the jury again finds a willful violation.

REVERSED AND REMANDED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*