**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

AARON JENSEN,

     Plaintiff - Appellant/Cross-Appellee,

v.

WEST JORDAN CITY, a Utah municipal corporation,

     Defendant - Appellee/
     Cross-Appellant,

and

ROBERT SHOBER, in his official capacity,

     Defendant - Appellee.

_____

AARON JENSEN,

     Plaintiff - Appellee,

v.

WEST JORDAN CITY, a Utah municipal corporation,

     Defendant - Appellant,

and

ROBERT SHOBER, in his official capacity,

Nos. 17-4173 & 17-4181

No. 17-4196

Defendant.

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:12-CV-00736-DAK)**

_____

April Hollingsworth, Hollingsworth Law Office, LLC, Salt Lake City, Utah, for Appellant/Cross-Appellee.

Dani N. Cepernich, Snow, Christensen & Martineau, Salt Lake City, Utah (Nathan R. Skeen and Maralyn M. English, Snow, Christensen & Martineau, Salt Lake City, Utah; Paul Dodd, West Jordan, Utah, with her on the briefs), for Appellees/Cross-Appellant

_____

Before **BRISCOE**, **MORITZ**, and **EID**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

Plaintiff-appellant Aaron Jensen sued defendant-appellees West Jordan City and Robert Shober for Title VII retaliation, First Amendment retaliation, malicious prosecution, and breach of contract. At trial, the jury returned a verdict in favor of Jensen on all his claims and awarded $2.77 million in damages. The jury did not properly fill out the verdict form, however, so the district court instructed the jury to correct its error. When the jury returned the corrected verdict, it had apportioned most of the damages to Jensen's Title VII claim. Because the district court concluded that Title VII's statutory damages cap applied, the court reduced the total amount of the award to $344,000. Both parties appealed. They raise nine issues on appeal, but we conclude that none of them warrants reversal and affirm.

2

## I. Factual Background

From 1996 to 2009, Jensen worked as a police officer for West Jordan City ("West Jordan"). S.A. at 923, 1553–57. On April 29, 2009, he voluntarily resigned as part of a settlement agreement with West Jordan. *See* S.A. at 1553–57. At the time of Jensen's resignation, his relationship with West Jordan had become strained. Jensen believed that he had been sexually harassed by superiors, and he complained of harassment on multiple occasions in 2008, the last being in September 2008. *See* S.A. at 945. That month, West Jordan opened an Internal Affairs ("IA") investigation into Jensen due to a concern that Jensen was not properly filling out his reports. *See* S.A. at 698, 1135.

The following month, in October 2008, West Jordan placed Jensen on administrative leave. *See* S.A. at 661, 702. On January 8, 2009, while he was still on administrative leave, Jensen filed a discrimination charge with the Utah Anti-Discrimination and Labor Division and the Equal Employment Opportunity Commission ("EEOC"). *See* S.A. at 960–61. Shortly thereafter, Jensen entered a settlement agreement with West Jordan. Under the agreement, Jensen received $80,000 in exchange for the resolution of his discrimination charges and his resignation from West Jordan. *See* S.A. at 1553–57, 1564–66; A. at 198. Jensen and West Jordan signed the settlement documents on April 29, 2009. The documents included the Settlement Agreement and the Negotiated Settlement Agreement. *See* A. at 198. The Utah Anti-Discrimination and Labor Division signed the Settlement Agreement but not the Negotiated Settlement Agreement. *See id.*

3

West Jordan's IA investigation had continued during Jensen's administrative leave. On November 17, 2008, West Jordan transferred the case to the Utah Attorney General's office. *See* A. at 197. The AG's office found what it believed to be evidence of criminal activity by Jensen and, pursuant to an existing agreement with the Salt Lake County District Attorney's Office, sent the case to the Salt Lake County DA. *See* S.A. at 1414–17. The DA eventually decided to prosecute the case. *See* S.A. at 670, 898–900. Although the Salt Lake County DA prosecuted the case, West Jordan's City Attorney, Jeff Robinson, attended events associated with Jensen's criminal case and offered to help draft documents. A. at 441.

On the day Jensen resigned, two of his co-workers, Reed Motzkus and Burdette Shumway, cleaned out his office and discovered an envelope containing heroin balloons and copies of two driver's licenses, all of which had been obtained during a traffic stop. A. at 198; *see also* S.A. at 477–78, 1494. After hearing about Motzkus and Shumway's discovery, Lieutenant Shober began "looking to find out where [the drugs] came from." S.A. at 737–38. Lt. Shober was Jensen's supervisor as well as one of the individuals against whom Jensen had complained. *See* S.A. at 945. Shober admitted that he had been "frustrated" by Jensen's complaints of sexual harassment. *See* S.A. at 699–700; *see also* A. at 197.

As part of Shober's investigation, he contacted the two individuals from whom the drugs had been seized. A. at 199. Through these discussions, Lt. Shober learned that Jensen had also taken money from these individuals, but West Jordan had no record of this. A. at 199; *see also* S.A. at 778–85. Lt. Shober communicated this

4

information to Captain Gary Cox, who, in turn, gave it to the DA. A. at 199; *see also* S.A. at 784–85. Shober also spoke with Police Chief Ken McGuire "about the information that came to [him]" regarding the criminal allegations against Jensen. S.A. at 745.

Additionally, on April 24, 2008, while Jensen was still working for West Jordan, he returned "$583 in cash to the legal counsel of an individual who was booked into jail." A. at 199. But "$1,239 was documented as being taken from [this individual] and given to Mr. Jensen for handling." *Id.*; *see also* S.A. at 1514–35. When the incarcerated individual asked for the rest of his money, Lt. Shober could not locate it, leaving West Jordan to cover the balance. *See* S.A. at 1514. At the direction of Chief McGuire, Shober reported this information to Captain Cox, A. at 728, and West Jordan ultimately forwarded this evidence to the DA. *See* A. at 199; *see also* S.A. at 731–32.

Jensen was arrested on May 6, 2010, and charged with two counts of misusing public money and one count of distribution of or arranging to distribute a controlled substance. *See* S.A. at 1490–94. Following a preliminary hearing in December 2010, the trial judge dismissed two of the three charges with prejudice after finding a lack of probable cause. *See* A. at 200. Despite this finding, the court concluded that the state had not brought the charges in bad faith. *Id.* Subsequently, the Salt Lake DA's office transferred the case to the Davis County DA's office. *See id.* The Davis County DA dismissed the remaining charge with prejudice on April 4, 2013. *See id.*

Between the time of his resignation and his arrest, Jensen had secured a new job. A. at 201; *see also* S.A. at 413–15. However, his new employer terminated him a few days after his arrest. A. at 201; *see also* S.A. at 981. Since then, Jensen has lost his marriage and his house. *See* S.A. at 1014–16, 1023–24. He has battled depression and anxiety. *See id.* And he alleges that he has been unable to get another job as a police officer.

## II.    Procedural History

In March 2011, Jensen filed a second EEOC charge of discrimination. A. at 200. In this charge, Jensen alleged that West Jordan retaliated against him for the earlier EEOC charge by fabricating the evidence of misconduct that led to his arrest. *Id.* After the EEOC issued a notice of rights, Jensen filed this lawsuit. A. at 200–01. The complaint asserted causes of action against West Jordan and, in their official capacities, Dan Gallagher, Lt. Shober, and Does 1–10. A. at 55.[1]

The district court entered a stipulated scheduling order on October 23, 2014. A. at 93–96. The order indicated that the last date to file a motion to amend pleadings was February 16, 2015, and that the last date to file a motion to add additional parties had already passed. A. at 94. On February 15, 2015, Jensen filed a motion to amend his complaint. A. at 99. The magistrate judge recommended granting the motion generally but denying it to the extent that it sought to add new parties (since that deadline had passed). Relevant here, Jensen objected to the

----

[1] Jensen's amended complaint dropped the claims against Gallagher and Does 1–10. *See* A. at 152.

magistrate's recommendation "denying Mr. Jensen leave to add" Lt. Shober in his individual capacity. A. at 173. Over Jensen's objections, the district court adopted the magistrate's recommendation. A. at 178–79.

On May 15, 2017 (less than a month before trial), Jensen filed another motion to amend the complaint and add Lt. Shober in his individual capacity. *See* A. at 227. The district court denied the motion. Additionally, the district court granted the defendants' motion to dismiss the claims against Lt. Shober in his official capacity. *See* A. at 254–55.

The case was tried before a jury in June 2017. *See* A. at 40–43. Prior to trial, both parties submitted proposed verdict forms. A. at 271, 279. Jensen's proposed form did not provide spaces for the jury to allocate damages among the remaining claims (at this point, the remaining claims were Title VII retaliation, First Amendment retaliation and malicious prosecution under § 1983, and breach of contract). A. at 279–81. By contrast, West Jordan's proposed verdict form included spaces for the jury to allocate specific damages to each claim. A. at 278.

Jensen objected to West Jordan's proposed verdict form because he thought there was no meaningful way for the jury to allocate damages among his claims. *See* A. at 295, 1073–74. He asserted that all the damages flowed from the same injury— that is, the alleged retaliatory fabrication of evidence. *See id.* The district court ultimately used a verdict form of its own design that had spaces for claim-specific damages but gave the jury an option to indicate if it thought the damages were indivisible. *See* A. at 345–50, 1080.

7

Jensen's counsel took issue with the option to allocate damages in the court's verdict form. In closing, she suggested to the jury that its total damages award "should apply for each of the causes of action, because [she didn't] see the damages as being different for each cause of action." A. at 1140.

When the jury returned its initial verdict in Jensen's favor on all counts, it awarded Jensen $2.77 million in damages, but it reported that each specific claim resulted in zero damages. A. at 1204–08.[2] West Jordan's counsel objected to the verdict—contending that it was "inconsistent [] because there are zero damages for each of the claims, so the total should be zero, not what it is." A. at 1209. West Jordan also emphasized that if it "prevailed on an issue on appeal," there would be no way of knowing which damages were associated with that issue. A. at 1210.

Agreeing with West Jordan that the verdict was problematic, the district court instructed the jury that "[w]e need you to go back and allocate, as best you can, the [total damages award] for the various claims as best you can do that." A. at 1211. When the jury returned, it had allocated the majority of the damages to the Title VII claim—specifically, $1,000,400 in economic damages and $1,740,000 in non-economic damages. A. at 1211–12. The jury allocated the remainder of the original award ($34,000) to the other claims. A. at 1211–13.

Subsequently, West Jordan filed a motion to reduce the damages award. It argued that the Title VII award was subject to Title VII's $300,000 damages cap. In

---

[2] The total award consisted of $1,024,400 in economic damages and $1,750,000 in non-economic damages.

opposition to West Jordan's motion, and in support of his own proposed judgment, Jensen submitted a declaration from the jury foreperson, Gerrit Dirkmaat, but the district court did not consider Dirkmaat's declaration.[3] The district court agreed with West Jordan that the award was subject to Title VII's damages cap. Consequently, it entered judgment in the amount of $334,000 ($300,000 for the Title VII damages plus $34,000 for the remaining damages) on July 5, 2017. *See* A. at 365.

West Jordan also filed a renewed motion for judgment as a matter of law and a motion for new trial or remittitur. *See* S.A. at 147, 205. Relevant here, West Jordan contended that the verdict was excessive, Jensen's Title VII claim was untimely, the damages award was speculative, and the settlement documents did not constitute a single agreement. *See id.* Jensen filed a motion to alter or amend the judgment. *See* A. at 364. The district court denied all these motions. *See* A. at 426–77.

Finally, Jensen filed a motion for attorney's fees that the district court granted in part and denied in part. It awarded fees but did not give all of Jensen's attorneys the rates they requested. Specifically, April Hollingsworth requested $350 per hour, but the court awarded her $285 per hour. And Brenda Beaton requested $300 per hour for the majority of her work (she submitted a declaration stating that her hourly

---

[3] West Jordan objected to this declaration under Federal Rule of Evidence 606(b), which generally prohibits courts from considering a juror's statements made during deliberations in a proceeding concerning the validity of the verdict. *See* A. at 370–73. The district court did not rule on the objection, but rather considered "the amounts written on the Special Verdict Form . . . to represent the intention of the jury." A. at 429 n.1. The court also stated that it would not "alter the amounts or the allocations on the Special Verdict Form based on a declaration from the jury foreperson." *Id.*

rate was originally $225 but had increased to $300 in early 2015), but the court awarded her $225 per hour.

Challenging the court's attorney's fees determinations, Jensen filed a supplemental motion for fees that contained additional information. The court denied this motion stating that it had "explained in its previous order the reasons why these billable rates were adjusted and [would] therefore not revisit whether these reductions were reasonable." A. at 506.

This case represents three appeals consolidated into one. The consolidated appeal raises the following issues: (1) the district court's denials of Jensen's motions to amend his complaint; (2) the district court's apportionment instructions, its decision to reduce the jury's award, and its related denial of Jensen's motion to alter or amend the judgment; and (3) the district court's decision to reduce Hollingsworth's and Beaton's hourly rates. Jensen appealed these issues in case numbers 17-4173 and 17-4196. The appeal also includes issues mentioned above related to the district court's denial of West Jordan's renewed motion for judgment as a matter of law. West Jordan raised these issues in its cross appeal (case number 17-4181).

### III.  Discussion

The parties raise several issues on appeal. We consider them in the following order: whether the district court abused its discretion by giving the challenged jury instructions; whether Title VII's statutory damages cap applies to Jensen's Title VII award; whether the district court abused its discretion when it lowered two of

10

Jensen's attorney's hourly rates; whether the district court abused its discretion by twice refusing to allow Jensen to add Lt. Shober in his individual capacity; whether the jury's award was excessive; whether the district court erred by denying West Jordan's renewed motion for judgment as a matter of law; and whether the two settlement documents constituted a single agreement.

## A.    The Court's Jury Instruction Regarding Apportionment

"We review the district court's decision about whether to give a particular instruction for abuse of discretion," and "we review de novo whether, as a whole, the district court's jury instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable principles." *Martinez v. Caterpillar, Inc.*, 572 F.3d 1129, 1132 (10th Cir.2009). "[W]e read and evaluate the instructions in light of the entire record." *United States v. Sorensen*, 801 F.3d 1217, 1229 (10th Cir. 2015). The jury instructions "need not be flawless," *id.*, but we must be satisfied that "the jury was [not] misled in any way." *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1155 (10th Cir. 2012). "We will reverse only in those cases where [we have] a substantial doubt whether the jury was fairly guided in its deliberations." *Sorensen*, 801 F.3d at 1236 (quotations omitted) (alteration in original).[4]

---

[4] The dissent argues that we apply the wrong standard because we fail to recognize the distinction between preverdict and postverdict jury instructions. But the dissent admits that "[our] analysis captures the same two steps" as its proposed framework. Dissent at 7.

11

The district court's instructions regarding apportionment did not mislead the jury about the governing law. "Where a single injury gives rise to more than one claim for relief, a plaintiff may recover his damages under any claim, but he may recover them only once." *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1261–62 (10th Cir. 1988) (*overruled on other grounds as recognized by Anixter v. Home–Stake Prod. Co.*, 77 F.3d 1215, 1231 (10th Cir. 1996)); *Mason v. Oklahoma Tpk. Auth.*, 115 F.3d 1442, 1459 (10th Cir. 1997) (*overruled on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011) ("[D]ouble recovery is precluded when alternative theories seeking the same relief are pled and tried together.")). Damages "are to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm." Restatement (Second) of Torts § 433A (1965); *Fox v. Ford Motor Co.*, 575 F.2d 774, 787 (10th Cir. 1978). "Damages for any other harm cannot be apportioned among two or more causes." Restatement (Second) of Torts § 433A (1965). In other words, a jury should apportion damages where there is a reasonable basis for doing so but the jury cannot be required to apportion damages where the injury is indivisible. *Id.*; *see O'Neill v. Krzeminski*, 839 F.2d 9, 12 (2d Cir. 1988) ("Normally, a jury need not allocate compensatory damages . . . .").

Whether damages are "capable of apportionment among two or more causes is a question of law" for the court to decide. Restatement (Second) of Torts § 434 (1965) (comment d). But "once it is determined that the harm is capable of being apportioned,

12

the actual apportionment of the damages among the various causes is a question of fact, which is to be determined by the jury." *Id.*

We conclude, after reviewing the district court's instructions as a whole, that the jury was not misled when the court instructed it to "allocate, as best [it could], the [total damages award] for the various claims." The district court instructed the jury to "justly, fairly, and adequately compensate" Jensen for the damage that he suffered, A. at 309, 310, but cautioned that it "must not award compensatory damages more than once for the same injury," A. at 309. The district court further instructed the jury on the elements of each claim and told the jury the types of damages that could be awarded. A. at 317–40.

The district court also allowed Jensen's counsel to argue in closing that the jury could determine the apportionment of the damages among Jensen's claims. *See* A. at 1139–43. Jensen's counsel advised the jury that its total damages award "should apply for each of the causes of action, because [she didn't] see the damages as being different for each cause of action." A. at 1140. She also informed the jury that they would be "asked what amount of [each claim's] damages is different from the damages assessed in the prior claims" and she "suggest[ed] for each one of those questions that [the jury] just put a zero to maintain a consistent figure across each of the claims." A. at 1141.

Furthermore, the verdict form allowed the jury to follow the instructions of Jensen's counsel and decide how damages should be apportioned among each of Jensen's claims. For example, on question fourteen, the verdict form provided a space for the jury to indicate the amount of damages that resulted from Jensen's

13

breach of contract claims. On question fifteen, however, the verdict form provided a

space for the jury to indicate the amount of those damages that were "different than

and in addition to" the damages resulting from the other claims.[5] If the jury indicated

that the damages for breach of contract were not "different than and in addition to"

the damages for the other claims, then those damages would not be apportioned

specifically to Jensen's breach of contract claims. Thus, the jury was able to decide

the manner of apportionment by indicating whether any claim's damages were

"different than or in addition to" the damages associated with any other claim.[6]

---

[5] Questions fourteen and fifteen from the verdict form are reproduced here.

    14. What is the amount of damages, if any, Mr. Jensen proved by a preponderance of the evidence that Mr. Jensen suffered as a result of the West Jordan City's breach of the settlement agreement, the negotiated settlement agreement, or the covenant of good faith and fair dealing?

    15. What is the amount of damages, if any, you find Mr. Jensen incurred as a result of West Jordan City's breach of the settlement agreement, the negotiated settlement agreement, or the covenant of good faith and fair dealing that are different than and in addition to the damages you found in Questions 2, 5, and 8 above?"

A. at 349.

[6] In Jensen's reply brief, he argues that we should consider the jury foreperson's affidavit as evidence that the district court's jury instruction subverted the will of the jury. However, because Jensen failed to make this argument in his opening brief, we decline to consider it. *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."). Although Jensen mentioned the affidavit in his "Statement of the Case" section, he never argued that we should consider it as evidence of the district court's error. *See Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1133 n.4 (10th Cir. 2004) ("Scattered statements in the appellant's brief are not enough to preserve an issue for appeal.").

When viewing the district court's jury instructions as a whole, we do not have "a substantial doubt [as to] whether the jury was fairly guided in its deliberations." *Sorensen*, 801 F.3d at 1236. Therefore, we do not find legal error in the district court's instructions regarding apportionment.

Additionally, the district court did not abuse its discretion by issuing the particular instruction that the jury should "allocate, as best [it] can, the [total damages awards] for the various claims." First, whether damages are "capable of apportionment among two or more causes is a question of law" for the court to decide. Restatement (Second) of Torts § 434 (1965) (comment d). Here, apportionment was appropriate because there was a reasonable basis for dividing Jensen's injury among his claims. Generally, damages are to be apportioned among claims where "(a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm." Restatement (Second) of Torts § 433A (1965). Jensen pursued claims against West Jordan for Title VII retaliation, § 1983 retaliation and malicious prosecution, and breach of contract. Each claim required proof of different elements, and certain damages sought by Jensen could not be recovered under each of his claims. For example, Jensen's breach of contract claims did not allow recovery for emotional distress. Additionally, his Title VII claim did not allow recovery for harms that occurred more than 300 days before he filed his claim with the EEOC. This prevented recovery under Title VII for damages stemming from both Jensen's arrest as well as the criminal

15

investigation against him. Accordingly, a reasonable basis for apportionment existed.

Second, the district court acted within its discretion by instructing the jury to amend its initial verdict because the verdict contained inconsistencies that could have created "a potential appeal problem." A. at 1210. The initial verdict awarded Jensen $2.77 million in total damages but it reported that each specific claim resulted in no damages. A. at 1209. Thus, the verdict form did not consistently state whether the total damages should have been zero or $2.77 million. Additionally, if West Jordan prevailed on an aspect of its appeal that concerned only certain claims, there would be no way of knowing which damages were associated with those claims. *See* A. at 1210; *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1229 (10th Cir. 1996) ("Generally, where a jury has returned a general verdict and one theory of liability upon which the verdict may have rested was erroneous, the verdict cannot stand because one cannot determine whether the jury relied on the improper ground.").

In sum, the district court did not abuse its discretion by issuing the particular instruction that the jury should "allocate, as best [it] can, the [total damages award]," and, when the instructions are read as a whole, the jury was not misled as to the governing law. Therefore, the district court's jury instructions regarding apportionment were not erroneous.

## B.     Title VII's Statutory Damages Cap

It is unclear what standard of review applies to the district court's Title VII statutory-damages-cap determination. *Nelson v. Rehab. Enters. of N. E. Wyo.*, 124

F.3d 217 (10th Cir. 1997) (Table) ("[W]e have found no cases indicating what standard of review to apply in such a case . . . ."). This uncertainty is not problematic because the district court's determination would pass under any standard of review.

The Title VII damages cap applies to Jensen's damages award. Neither party disputes that the non-economic damages award of $1,740,000 is subject to the cap. Additionally, the economic damages award of $1,000,400 is an award of lost future earnings that is subject to the cap.

Title VII's damages cap limits recovery to $300,000 against employers who have more than 500 employees. 42 U.S.C. § 1981a(b)(3)(D). But the cap applies only to remedies that were not available under the pre-1991 version of the Civil Rights Act. 42 U.S.C. § 1981a(b)(3) (listing "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses" as remedies limited by the cap). Relevant here, front pay is a remedy that was available under the pre-1991 version of the Civil Rights Act, but lost future earnings are not. *See Williams v. Pharmacia, Inc.*, 137 F.3d 944, 952 (7th Cir. 1998) (classifying lost future earning capacity as "a nonpecuniary injury" added to Title VII in the 1991 Civil Rights Act).

The district court properly characterized Jensen's economic damages award as lost future earnings. The jury "awarded Mr. Jensen" this amount because of his "inability to go back to being a police officer following his arrest." A. at 429. By claiming that he can no longer work as a police officer, Jensen is effectively claiming that West Jordan "narrowed the range of economic opportunities available to him . . .

17

[and] caused a diminution in his ability to earn a living." A. at 433 (alteration in original) (quoting *Williams*, 137 F.3d at 952). As the district court noted, this is the essence of a lost future earnings award. *See Williams*, 137 F.3d at 952.

Additionally, the district court correctly concluded that lost future earnings are subject to Title VII's damages cap because lost future earnings are closely analogous to common law torts that were not available under the pre-1991 version of the statute. *See id.* Specifically, the district court reasoned that lost future earnings are analogous to "injury to professional standing" and "injury to character and reputation." *See id.* The EEOC has stated that both "injury to professional standing" and "injury to character and reputation" are "other nonpecuniary losses" subject to Title VII's cap. *Id.*; *see* 42 U.S.C. § 1981a(b)(3) (stating that "other nonpecuniary losses" are subject to the cap). The similarity between lost future earnings and these torts led the Seventh Circuit to conclude that lost future earnings were also "a nonpecuniary injury" added to Title VII in the 1991 Civil Rights Act. *See Williams*, 137 F.3d at 952. Because of the similarity between lost future earnings and common law torts that were not available under the pre-1991 version of the statute, we agree with the Seventh Circuit's analysis in *Williams* and conclude that Jensen's lost future earnings award falls within the category of "other nonpecuniary losses." Thus, the district court correctly concluded that Jensen's Title VII award is subject to Title VII's damages cap.

18

## C. Attorney's Fees

In a Title VII discrimination action, the prevailing party may recover "reasonable" attorney's fees. 42 U.S.C. § 1988(b). "[T]he burden is on the fee applicant to produce satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). "The quality of the lawyer's performance in the case should also be considered." *Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan.*, 157 F.3d 1243, 1257 (10th Cir. 1998).

We review the reasonableness of the district court's attorney's fees award for abuse of discretion. *Robinson v. City of Edmond*, 160 F.3d 1275, 1280 (10th Cir. 1998). An abuse of discretion occurs when a trial court's decision is "arbitrary, capricious, whimsical, or manifestly unreasonable." *Somerlott v. Cherokee Nation Distributors, Inc.*, 686 F.3d 1144, 1152 (10th Cir. 2012). Under this standard, "a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.*

Here, the district court did not abuse its discretion by reducing the hourly rate for two of Jensen's attorneys, April Hollingsworth and Brenda Beaton. The district court considered the evidence submitted by Hollingsworth and Beaton but decided that their requested rates were too high. A. at 466–67.

19

Hollingsworth submitted declarations from Lois Baar and Christina Jepson to support her requested rate of $350 per hour. *Id.* The district court considered these declarations but concluded that Hollingsworth was entitled to only $285 per hour because the best indicator of her rate was the rates charged by Erik Strindberg and Lauren Skolnick, two attorneys who assisted Hollingsworth with Jensen's case. *Id.* Although both Baar and Jepson declared that Hollingsworth's requested rate of $350 was "within the average community standards for hourly rates for attorneys of her experience and skill in employment law in Utah," A. at 758, 760, the district court decided that a rate of $285 per hour "best reflect[ed] the rate charged by attorneys in the community with reasonably comparable skill, experience, and reputation to Ms. Hollingsworth," A. at 467.

The district court noted that Strindberg and Skolnick—who charged $300 and $275 per hour respectively—operated a practice similar to Hollingsworth's and were more experienced. A. at 466. While Hollingsworth graduated law school in 1996, Strindberg graduated in 1983 and Skolnick graduated in 1995. *Id.* In fact, Hollingsworth began practicing employment law at their firm, Strindberg & Skolnick, LLC. A. at 652. Additionally, the district court stated that "the conduct of Mr. Jensen's attorney was far from the epitome of professionalism." A. at 462; *see Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1200–01 (10th Cir. 1986) ("We customarily defer to the District Court's [fees award] because an appellate court is not well suited to assess the course of litigation and the quality of counsel.").

Because the district court determined Hollingsworth's hourly rate by relying on the rates charged by two more-experienced attorneys who operated a practice similar to Hollingsworth's, the district court did not abuse its discretion.

As for Beaton, the court considered her experience as well. It found that although Beaton "is an experienced attorney," she "is relatively inexperienced in civil rights and employment law." A. at 467. Accordingly, the court concluded that her original rate of $225 per hour was appropriate but that she had "not provided sufficient evidence to justify an increase in [her] rate to $300 in the middle of this litigation." *Id.* We do not see an abuse of discretion in this determination. Rather, the district court carefully considered the evidence before it and awarded reasonable fees.

We also note that the district court properly refused to consider the evidence in Jensen's supplemental motion for attorney's fees. We agree with West Jordan that this was in essence a motion for reconsideration, and Jensen has failed to show how this motion satisfied any of the established grounds for reconsideration. Accordingly, we conclude that the district court did not abuse its discretion by refusing to consider the additional evidence presented in the supplemental motion for attorney's fees. *See Servants of Paraclete v. Does*, 204 F.3d 1005, 1009 (10th Cir. 2000) ("We review the district court's denial of a . . . motion [for reconsideration] for abuse of discretion.").

21

## D.     Denial of Leave to Amend

We review a district court's denial of leave to amend the complaint for abuse of discretion. *Minter v. Prime Equipment Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006). Federal Rule of Civil Procedure 15(a) provides that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993).

The district court did not abuse its discretion by denying both of Jensen's motions to amend his complaint by adding Lt. Shober in his individual capacity. Jensen filed his first motion to amend two and a half years into the litigation after the district court's amended scheduling order had already stated that the time for adding additional parties had passed.[7] This qualified as an undue delay under the circumstances of this case.

As for Jensen's second motion to amend, it was filed a month before trial was scheduled to begin when the parties were three and a half years into the litigation. This also qualified as an undue delay. Moreover, had the district court granted

---

[7] Jensen highlights that as soon as Hollingsworth was retained as counsel she sought to add Lt. Shober in his individual capacity. *See* Aplt. Br. at 40–41. He implies that the delay was due to previous counsel's bad lawyering. We do not see how this is relevant. Poor lawyering might be grounds for a malpractice claim against prior counsel, but it is not grounds for leave to amend. *Cf.* Fed. R. Civ. P. 15(a).

22

Jensen's motion at that time, the defendants would have been prejudiced.

Consequently, the district court did not abuse its discretion by denying either of

Jensen's motions for leave to amend.

### E.    Whether the Verdict was Excessive

West Jordan contends that the district court's damages awards were excessive

as an alternative to its previous arguments that the district court did not err by either

issuing the challenged jury instruction or applying Title VII's damages cap.  Aple.

Br. at 30 ("Even if the district court erred in instructing the jury to apportion damages

or reducing the damages consistent with Title VII's damages caps, this Court should

still affirm . . . [because] the jury's finding of damages was excessive and

unsupported.").  Because we agree with West Jordan's previous arguments that the

district court did not err by issuing the challenged jury instruction or applying Title

VII's damages cap, we need not consider West Jordan's alternative argument that the

damages awards were excessive.

### F.    The Motion for Judgment as a Matter of Law

We review de novo the district court's denial of West Jordan's renewed

motion for judgment as a matter of law.  *Harolds Stores, Inc. v. Dillard Dep't Stores,*

*Inc.*, 82 F.3d 1533, 1546 (10th Cir. 1996).  In doing so, we apply the same standards

used by the district court.  That is, "[w]e must affirm if, viewing the record in the

light most favorable to [the non-moving party], there is evidence upon which the jury

could properly return a verdict for [the non-moving party]."  *Id.*  "We do not weigh

23

the evidence, pass on the credibility of the witnesses, or substitute our conclusions for that of the jury." *Id.*

West Jordan argues that there was insufficient evidence for the jury to properly return a verdict for Jensen on three issues: (1) the timeliness of Jensen's Title VII claim; (2) the presence of a policy or regulation sufficient to support municipal liability; and (3) the existence of causation sufficient to support the damages award. We address each of these issues below.

### i. The Timeliness of Jensen's Title VII Claim

"In states with a state agency that has authority over employment discrimination claims . . . employees have up to 300 days to file an EEOC charge if they first file a charge with the state agency. A claim not filed within these statutory limits is time barred." *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 628 (10th Cir. 2012) (citations omitted). "Compliance with the 300–day filing requirement . . . is a condition precedent to suit that functions like a statute of limitations and is subject to waiver, estoppel, and equitable tolling." *Million v. Frank*, 47 F.3d 385, 389 (10th Cir. 1995). "[E]ach retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice [and a plaintiff] can only file a charge to cover discrete acts that occurred within [300 days of his filing]." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (quotations omitted). The claim accrues when "a reasonable employee would have known of the employer's" retaliatory action. *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1177 (10th Cir. 2011).

24

West Jordan contends that Jensen's Title VII claim was untimely because the only adverse employment actions that Jensen identified during the 300-day filing window were that West Jordan provided discovery information to the AG and DA, West Jordan complied with subpoenas, and West Jordan offered to draft a motion in limine. We disagree. The district court concluded that there was sufficient evidence presented at trial for the jury to find that during the 300-day window, "[West Jordan] employees knowingly provided false information or knowingly withheld exculpatory information at the preliminary hearing." A. at 437. West Jordan has not given us any reason to overturn this finding. Thus, viewing the evidence in the light most favorable to Jensen, we agree with the district court that there was sufficient evidence that Jensen's Title VII claim was timely.

West Jordan further argues that Jensen's Title VII claim was untimely because any unlawful retaliatory action taken by West Jordan within the 300-day window was a natural effect and consequence of the main retaliatory action—the filing of the criminal case—which occurred outside the 300-day window. *See* Aple. Br. at 46. We disagree.

As support for its argument, West Jordan points us to *Delaware State College v. Ricks*, 449 U.S. 250 (1980). In *Ricks*, the plaintiff, a college professor, contended that he was discriminatorily denied tenure. *See id.* at 255. But he did not file his EEOC charge quickly enough. *See id.* at 254. When the issue came up in court, he asserted that his termination should be viewed as a discrete discriminatory act and that his EEOC charge was timely when viewed against that act. *See id.* at 254–56.

25

The Supreme Court disagreed: "It appears that termination of employment at Delaware State is a delayed, but inevitable, consequence of the denial of tenure." *Id.* at 257–58. "[Consequently,] the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made and communicated to Ricks." *Id.* at 258. "That is so even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position—did not occur until later." *Id.*

Here, the jury could have found that during the 300-day filing window, West Jordan knowingly provided false information and/or intentionally withheld exculpatory evidence. Unlike the firing in *Ricks*, knowingly providing false information and/or intentionally withholding exculpatory evidence is not a "delayed, but inevitable[] consequence of" filing a criminal case against someone. *See id.* at 257. Therefore, we agree with the district court and conclude that, viewing the evidence in the light most favorable to Jensen, there was a sufficient basis for the jury to find that Jensen's Title VII claim was not time barred.

### ii. The Presence of a Policy or Custom Sufficient to Support Municipal Liability

"A municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotations omitted). "Rather, to establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury

26

alleged." *Id.* Importantly, "a municipal policy" includes "not only policy statements, ordinances, and regulations but [also] the individual decisions of city officials who have 'final policy making authority.'" *David v. City and Cty. of Denver*, 101 F.3d 1344, 1357 (10th Cir. 1996) (citation omitted). Municipal policy also includes instances where the "authorized policymakers approve a subordinate's decision and the basis for it." *Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009). In other words, "their ratification will be chargeable to the municipality." *Id.* Similarly, a custom is a practice that is so "continuing, persistent, and widespread" that it has "the force of law." *Carney v. City and Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008). Custom can be established by "a series of decisions by a subordinate official . . . of which the supervisor must have been aware." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988); *Mitchell v. City & Cty. of Denver*, 112 F. App'x 662, 672 (10th Cir. 2004) (unpublished).

West Jordan contends that Jensen did not provide evidence of a policy or custom to support the jury's imposition of municipal liability. *See* Aple. Br. at 49. At trial, "the jury was instructed that the City manager, the Chief of Police, and the City Attorney of [West Jordan] all have final policy making authority." A. at 439–40. Neither party has challenged this instruction. Accordingly, municipal liability hinges on whether any of these three individuals ratified a policy or were aware of a series of decisions from subordinates that was sufficiently prevalent to establish a custom. The district court concluded that "the jury was presented with a legally

27

sufficient evidentiary basis to find municipal liability against [West Jordan]" based on the conduct of the City Attorney, Jeff Robinson. A. at 441.

The district court's explanation of this decision is helpful:

Evidence was presented at trial, which the jury apparently found to be credible, suggesting that [West Jordan's] City Attorney, Jeff Robinson, showed unusual interest in Mr. Jensen's criminal case. Mr. Robinson's interest in the case was especially unusual because the case was being prosecuted by Salt Lake County and not by [West Jordan]. Some evidence was also presented that Mr. Robinson attended events associated with Mr. Jensen's criminal case, even though his attendance at the events was not necessary, and that he even offered to help draft documents for the case. Because the jury found that [West Jordan] employees decided to knowingly provide false information or knowingly withhold exculpatory information, or both, at a preliminary hearing, the jury could have also reasonably found through the evidence presented that Mr. Robinson must have been aware of this decision, even if the decision was formulated or initiated by other [West Jordan] employees. Because the jury apparently found that Mr. Robinson was aware of the [West Jordan] employees' decision, Mr [sic] Robinson can realistically be deemed to have adopted a policy authorizing the decision. Therefore, the court concludes that the jury was presented with a legally sufficient evidentiary basis to find municipal liability against [West Jordan].

A. at 440–41.

While this is a close issue, when we view the evidence in the light most favorable to Jensen, we agree with the district court's conclusion—there was enough evidence for the jury to find that the City Attorney "adopted a policy authorizing the decision" to either "knowingly provide false information or knowingly withhold exculpatory information." *See, e.g.*, S.A. at 657–82 (Direct Examination of Robinson).

Additionally, there was sufficient evidence that West Jordan's Chief of Police, Ken McGuire, ratified the retaliatory actions of Lieutenant Shober because McGuire

28

knew of Shober's actions as well as the basis for them. Lt. Shober testified that he was frustrated by Jensen's sexual harassment claims and had communicated his frustration to Chief McGuire. He also testified that he began "looking to find out where [the drugs that were found in Jensen's office] came from," even though the officer who found them had identified the drugs as "found property" and marked them for destruction. S.A. at 737–38. To find out where the drugs came from, Shober contacted the two individuals from whom the drugs had been seized. A. at 199. He then wrote a "supplemental narrative" about the information that he had uncovered. S.A. at 743. Shober gave this information to Captain Cox with the "assumption" that Cox would pass it along to the district attorney's office. S.A. at 744. Shober further testified that he spoke with Chief McGuire "about the information that came to [him]" regarding the criminal allegations against Jensen. S.A. at 745.

Based on Shober's testimony, the jury could have reasonably concluded that he investigated the drugs found in Jensen's office more aggressively due to his frustration with Jensen's sexual harassment allegations. Furthermore, Shober had communicated his frustration with Jensen's claims to Chief McGuire, spoken with Chief McGuire about the information he discovered in his investigation of Jensen, and reported information to Captain Cox at Chief McGuire's direction. Consequently, there was sufficient evidence for the jury to conclude that Chief McGuire knew of Shober's retaliatory "actions, as well as the basis for these actions." *Bryson*, 627 F.3d at 790.

29

In sum, viewing the evidence in the light most favorable to Jensen, we agree with the district court's conclusion that there was a legally sufficient basis for the jury to find that Jensen's injury was caused by West Jordan's custom or policy.

### iii. The Reliability of the Jury's Damages Award

Typically, to recover damages, the plaintiff must "show 'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013) (citation omitted). Relatedly, "[d]amages will not be awarded when the evidence surrounding them is uncertain or speculative." *Boehm v. Fox*, 473 F.2d 445, 448 (10th Cir. 1973). For injuries that "are of such character as to require skilled and professional persons to determine the cause and extent [of those injuries, they] must be proved by the testimony of medical experts." *Franklin v. Shelton*, 250 F.2d 92, 97 (10th Cir. 1957). But "a lay witness is competent to testify concerning those physical injuries and conditions which are susceptible to observation by an ordinary person." *Id.*

West Jordan contends that both the economic and non-economic damage awards were speculative. Regarding economic damages, West Jordan's argument rests on the fact that Jensen never offered evidence of specific available positions or evidence that Jensen would have been qualified for those positions. This argument overlooks the fact that "Jensen's claim for lost retirement benefits is based on a general harm to his reputation that prevented him from being able to get any Utah police officer position in the future." A. at 455. Accordingly, "Mr. Jensen did not have to present evidence of a specific job that he lost due to the retaliation." *Id.*

30

And, as discussed above, "[s]ufficient evidence was presented at trial that the damage to Mr. Jensen's reputation harmed his future prospects of becoming a police officer in Utah." *Id.*

As for non-economic damages, West Jordan contends that there was insufficient evidence to establish proximate causation because psychological injuries are not "susceptible to observation by an ordinary person," and thus, should have been established through expert testimony. *See* Aple. Br. at 54. West Jordan contends that Jensen could not have established these injuries through his expert, because Jensen's expert was not qualified to testify as to causation. *See id.* at 55. According to West Jordan, Jensen's expert "could not testify on the issue of causation because determining the cause of Mr. Jensen's psychological problems was not a necessary part of her therapy." *Id.* (referencing *Starling v. Union Pac. R. Co.*, 203 F.R.D. 468, 478–79 (D. Kan. 2001), and another district court case for support).

Even if we assume that West Jordan is correct, this argument still fails because it focuses exclusively on Jensen's psychological injuries. While "some evidence of Mr. Jensen's officially diagnosed psychological injuries, such as depression, was presented at trial, Mr. Jensen's psychological injuries were not the primary injuries discussed at trial related to Mr. Jensen's non-economic damages." A. at 450. Indeed, "[e]vidence of several other injuries, which are more susceptible to observation by an ordinary person, was presented at trial." *Id.* The jury learned of Jensen's "inability to get a job in the field that he desired; the loss of Mr. Jensen's marriage; the loss of association with Mr. Jensen's friends, who Mr. Jensen referred

31

to as family; the loss of Mr. Jensen's house; and the damage to Mr. Jensen's reputation in the law-enforcement community." *Id.*; *see also* S.A. at 1014–16, 1023–24. Thus, even if we exclude all of Jensen's psychological injuries from our evaluation of this issue, the district court correctly determined that there was still "a sufficient evidentiary basis . . . to sustain the jury's award of non-economic damages to Mr. Jensen." A. at 450.

## G.     The Settlement Documents

Whether two documents constitute a single contractual agreement is a question of law. *See Uhrhahn Constr. & Design, Inc. v. Hopkins*, 179 P.3d 808, 813 (Utah App. 2008) ("Whether a contract exists between parties is a question of law[.]" (alteration in original) (citation omitted)). Generally, for one contract to incorporate the terms of another, "the reference must be clear and unequivocal." *Hous. Auth. of Cty. of Salt Lake v. Snyder*, 44 P.3d 724, 729 (Utah 2002). But,

> where two or more instruments are executed by the same parties contemporaneously, or at different times in the course of the same transaction, and concern the same subject matter, they will be read and construed together so far as determining the respective rights and interests of the parties, although they do not in terms refer to each other.

*Bullfrog Marina, Inc. v. Lentz*, 501 P.2d 266, 271 (Utah 1972), disapproved of on other grounds by *Tangren Family Tr. v. Tangren*, 182 P.3d 326 (Utah 2008).

West Jordan contends that the Settlement Agreement and the Negotiated Settlement Agreement are two separate contracts and the district court erred in concluding that they constitute one agreement. West Jordan has raised this issue because if the agreements are evaluated separately, it believes it can show that it did

32

not violate the Settlement Agreement. *See* Reply Br. at 22–23. If West Jordan can establish that it is the prevailing party on the issue of whether it violated the Settlement Agreement, then it believes it can recover some of its own attorney's fees. *See id.* In any event, we conclude that the district court correctly determined that the two contracts constitute one agreement.

The Utah Supreme Court's test from *Bullfrog* is satisfied here: West Jordan and Jensen were parties to both the Settlement Agreement and the Negotiated Settlement Agreement; they entered into the agreements on the same day; and both agreements were entered into for the same purpose. The only thing that might lead us to conclude otherwise is that that the Utah Anti-Discrimination and Labor Division was a party to one of the agreements but not the other. We, however, agree with the district court that this lone fact is insufficient to overcome the other reasons for treating these two contracts as one agreement.[8] *See Bullfrog*, 501 P.2d at 271.

## IV.    Conclusion

For these reasons, we conclude that the district court did not commit any reversible error and AFFIRM.

---

[8] West Jordan has waived its argument, raised for the first time in this appeal in its reply brief, that the Settlement Agreement should be evaluated separately because it contains an integration clause. *See* Reply Br. at 23.

33

*Jensen v. West Jordan City*, Nos. 17-4173, 17-4181, 17-4196

**MORITZ**, Circuit Judge, dissenting:

I would find that the district court's postverdict instruction requiring the jury to allocate damages was legally inaccurate and substantially risked improperly influencing the jury. Because the proper remedy for such an error is to remand for a new trial, I respectfully dissent to the majority's decision affirming the verdict.

The majority concludes in section III.A that even though the jury issued a verdict that did *not* apportion damages, the district court's postverdict instruction *requiring* apportionment (and reducing the verdict from $2,774,400 to $344,000) was permissible. In reaching its flawed conclusion, the majority reasons that the jury somehow understood from the preverdict instructions that it could disregard the court's specific postverdict direction and choose not to allocate damages. But the record contains no support for that reasoning. The preverdict instructions said nothing about allocation, nor did the preverdict instructions suggest that the jury could disregard the court's direct postverdict instruction. Moreover, the majority does not discuss any of our precedent on postverdict instructions or recognize the substantial risk of coerciveness posed by such instructions. Thus, I would conclude that although the district court did not abuse its discretion in deciding to issue a postverdict instruction, the content of that postverdict instruction was erroneous. And because the appropriate remedy for an erroneous and prejudicial instruction is to remand and order a new trial, I would order a new trial.

Although I would remand for a new trial, I note that I also disagree with the majority's decision in section III.C to reduce the hourly attorney-fee rate for April

1

Hollingsworth. I would find that the district court abused its discretion when it reduced

Hollingsworth's rate because the record does not support its rationale for doing so.

## I.     Jury Instructions

Unlike the majority, I have a "substantial doubt" as to whether the district court's

postverdict instruction "fairly guided" the jury's deliberations. *United States v. Mullins*, 4

F.3d 898, 900 (10th Cir. 1993). I therefore conclude that the postverdict instruction

improperly required the jury to allocate Jensen's damages among the various claims, and

I would remand for a new trial.

Before reaching its initial verdict, the jury never received instructions on

allocating damages among the claims. Rather, during closing arguments, Jensen's

counsel suggested that Jensen's damages could *not* be fairly divided between each claim.

And she further suggested that instead, the total amount of damages "should apply for

each of the causes of action" because she "[did not] see the damages as being different

for each cause of action." App. vol. 5, 1140. According to Jensen's counsel, the damages

were different only insofar as some damages were economic and others were

noneconomic. After arguing that the damages should not be allocated between the claims,

Jensen's counsel discussed how the jury should complete the verdict form. She suggested

that the jury first calculate the total amount of economic and noneconomic damages and

then assign those total amounts to every individual claim. In other words, if the jury

awarded a total amount of $1.1 million in economic damages, the jury should assign $1.1

million to every claim that required economic damages. Jensen's counsel then explained

that the jury would be asked to state whether the damages for each claim were different

2

than the damages assigned to the prior claim. And she suggested that the jury "just put a zero [in response to those questions] to maintain a consistent figure across each of the [individual] claims." *Id.* at 1141.

After closing arguments, the district court provided written jury instructions—and those instructions did not require the jury to allocate damages to each claim. Instead, the written instructions simply cautioned against double recovery, stating that the jury "must not award compensatory damages more than once for the same injury." App. vol. 2, 309. The jury also received the written verdict form. And like the written instructions, the verdict form did not require allocation. Instead, the verdict form asked the jury to note whether the damages assigned to an individual claim were "different than and in addition to" the damages assigned to any preceding claim. *Id.* at 347. To better convey the construction of the verdict form, questions two, five, and six are reproduced here[1]:

> 2. What is the amount of damages, if any, Mr. Jensen proved by a preponderance of the evidence that Mr. Jensen suffered as a result of the Title VII retaliation?
> TITLE VII DAMAGES (ECONOMIC): $_____
> TITLE VII DAMAGES (NON[]ECONOMIC): $_____
> . . .
>
> 5. What is the amount of damages, if any, Mr. Jensen proved by a preponderance of the evidence that Mr. Jensen suffered as a result of the malicious prosecution?
> MALICIOUS PROSECUTION DAMAGES (ECONOMIC): $_____
> MALICIOUS PROSECUTION DAMAGES (NON[]ECONOMIC): $____
>
> 6. What is the amount of damages, if any, you find Mr. Jensen suffered as a result of the malicious prosecution that is different than and in addition to the damages you found in Question 2 above?

---

[1] I also attach as an appendix a copy of the verdict form that the jury completed and submitted after receiving the district court's postverdict instructions on allocation.

3

*Id.* at 346–47. Thus, the jury could either assign unique amounts to each claim that were "different from and in addition to" the amounts assigned to the previous claims, or the jury could assign the same lump-sum amount to every claim. *Id.* Finally, the verdict form left space at the end for the jury to calculate the total, lump-sum amounts of economic and noneconomic damages. Those questions stated:

> 16. For only the claims for which you answered "Yes" to Question Nos. 1, 4, 7, 10, 11, 12, and/or 13, what is the total amount of damages, other than damages for pain and suffering, Mr. Jensen has proven that he suffered that was caused by West Jordan City's conduct?
> TOTAL DAMAGES (ECONOMIC): $_____
>
> 17. For only the claims for which you answered "Yes" to Question Nos. 1, 4, and/or 7, what is the total amount of damages for pain and suffering that Mr. Jensen has proven that he suffered that was caused by West Jordan City's conduct?
> TOTAL DAMAGES (NON[]ECONOMIC): $_____

*Id.* at 350. And so, with Jensen's arguments in mind and the written instructions and verdict form in hand, the jury deliberated.

After deliberations, the jury issued a verdict that awarded zero dollars for each individual claim. Meaning, for questions two, five, and six reproduced above, the jury assigned zero dollars—instead of following Jensen's counsel's suggestion and assigning zero dollars to the questions asking about damages that were "different from and in addition to" damages for other claims, such as question six. *Id.* at 347. But regarding total damages, the jury awarded a lump-sum amount of $1,024,400 for Jensen's economic damages in response to question 16 and another lump-sum amount of $1,750,000 for Jensen's noneconomic damages in response to question 17.

4

During a subsequent postverdict conference with the court, West Jordan City (West Jordan) requested a postverdict instruction on allocating damages, asserting that the verdict was inconsistent because the jury awarded zero dollars on each individual claim yet awarded total damages of $2,774,400 for Jensen's economic and noneconomic claims. But Jensen's counsel argued that the verdict clearly showed that the jury did not want to allocate damages, and she requested that the court simply ask the jury to clarify the basis for its award. The district court followed West Jordan's suggestion, issuing the following instruction on allocation:

> *We need you to go back and allocate, as best you can, the totals you have arrived* at in the answers to Numbers 16[, the total amount of economic damages,] and 17[, the total amount of noneconomic damages,] for the various claims as best you can do that. So we'll send you back to deliberate on that.

App. vol. 5, 1211 (emphasis added). Not surprisingly, the jury reconvened and did exactly what the court's postverdict instruction directed it to do—it awarded the same total amount of economic and noneconomic damages, but it allocated those totals among each claim. Instead of assigning zero dollars for each claim, the jury assigned unique amounts. For example, in response to question two, the jury assigned $1,000,400 in economic damages and $1,740,000 in noneconomic damages to the Title VII claim. The jury then assigned $4,000 in economic damages and $5,000 in noneconomic damages for the malicious-prosecution claim (question five), and it also stated that those $9,000 in malicious-prosecution damages were "different than and in addition to" the Title VII damages (question six). App. vol. 2, 347. The jury took the same approach on questions 8 and 14 relating to Jensen's § 1983 and breach of contract claims. *See id.* at 347–48

5

(awarding $4,000 in economic damages and $5,000 in noneconomic damages for § 1983 claim and then stating all § 1983 damages were "different than and in addition to" previous damages); *id.* at 349 (awarding $4,000 for each breach of contract claim and then stating all contract damages were "different than and in addition to" previous damages). But at the end of the verdict form, the jury awarded the same total amounts for Jensen's economic and noneconomic damages, awarding $1,024,400 for Jensen's economic damages (question 16) and another lump-sum amount of $1,750,000 for Jensen's noneconomic damages (question 17).

The resulting allocation had the effect of significantly reducing Jensen's recovery. That's because Title VII limits a plaintiff's recovery to $300,000 when a plaintiff sues employers with more than 500 employees. 42 U.S.C. § 1981a(b)(3)(D). And as the majority notes, this damages cap applies here. Maj. op. 16. And as a result, Jensen's final award for all his claims was $344,000, rather than the approximately $2.77 million awarded by the jury.

On appeal, Jensen argues that the postverdict instruction improperly required the jury to allocate damages. I agree.

## A.     Framework for Evaluating Postverdict Instructions

In evaluating Jensen's challenge, neither the parties nor the majority rely on our caselaw considering the propriety of postverdict instructions. And perhaps that is because postverdict instructions are rare and therefore the caselaw guiding this issue is scant. But cases in our circuit suggest a straightforward, two-step framework for evaluating postverdict instructions. First, we consider whether a postverdict instruction is necessary.

6

*See Unit Drilling Co. v. Enron Oil & Gas Co.*, 108 F.3d 1186, 1191 (10th Cir. 1997) (stating that district courts should determine whether verdict is ambiguous in order to determine whether instructions to clarify are necessary); *Resolution Tr. Corp. v. Stone*, 998 F.2d 1534, 1547 (10th Cir. 1993) (approving postverdict questioning where verdict was ambiguous). Second, we consider whether the given instruction was proper. *See Resolution Tr. Corp.*, 998 F.2d at 1548 (analyzing whether postverdict questions were proper after determining verdict was ambiguous).

Although the majority does not expressly recognize this framework, its analysis captures the same two steps. *See* Maj. op. 11–15 (evaluating content of postverdict instruction as proper), 16 (concluding district court properly issued postverdict instruction because initial verdict was inconsistent). And like the majority, I too evaluate the postverdict instruction by analyzing both parts of the two-step framework.

### 1. A postverdict instruction was necessary to resolve an inconsistency.

At step one, district courts can issue postverdict instructions or ask questions when a verdict is ambiguous. *See Unit Drilling Co.*, 108 F.3d at 1191 (approving postverdict questioning and instructions to clarify ambiguous verdict). But these instructions must be used with caution because postverdict instructions pose a substantial risk of improperly influencing the jury. *See Resolution Tr. Corp.*, 998 F.2d at 1548 (noting postverdict questions are proper only in "limited instances"); *Perricone v. Kan. City S. Ry. Co.*, 704 F.2d 1376, 1378 (5th Cir. 1983) ("There is a substantial risk that such a supplemental instruction given immediately to the jury on its return is coercive."); *Bonner v. Guccione*,

7

178 F.3d 581, 590–91 (2d Cir. 1999) (approving *Perricone* and noting that postverdict instructions "risk that the jury will infer that the judge is conveying her unhappiness with the verdict"). Here, as the majority recognizes, the initial verdict was ambiguous because the zero-dollar amounts assigned to the individual claims do not correspond to the jury's total damages award of more than $2.7 million dollars. Thus, I would conclude, consistent with the majority, that the district court did not abuse its discretion by issuing a postverdict instruction. *See Martinez*, 572 F.3d at 1132.

### 2. The district court's postverdict instruction substantially risked improperly influencing the jury.

Because I agree that the district court did not abuse its discretion in deciding to issue a postverdict instruction, I next consider step two: whether the given instruction was proper. And I evaluate the content of the postverdict instructions de novo. *See id.* At this juncture, I depart from the majority. And I do so because the majority fails to recognize any distinction between postverdict and preverdict instructions, much less consider the unique and substantially coercive effect posed by postverdict instructions. Instead, the majority treats the postverdict instruction as if it were a preverdict instruction and elides any discussion of the relevant caselaw and context that should guide our analysis.

The majority first suggests that the postverdict instruction "regarding apportionment" was proper because it "did not mislead the jury about governing law." Maj. op. 11. I strongly disagree for three reasons. First, the postverdict instruction was not an instruction "regarding apportionment." *Id.* It did not, for example, explain what apportionment is or when it is appropriate. Instead, the postverdict instruction *directed*

8

the jury to *reconsider the verdict it had already rendered and apportion its damage totals*.

Second, the postverdict instruction could not have fairly guided the jury about governing law because the postverdict instruction did not accurately state the governing law. According to the majority, the postverdict instruction accurately stated the law because damages can be allocated among claims. But even if we assume the postverdict instruction accurately conveyed this general proposition, the instruction is materially incomplete. As the majority recognizes, although juries *can* allocate damages, *they are not required to do so* "where the injury is indivisible." Maj. op. 12 (relying on Restatement (Second) of Torts § 433A (1965) and *O'Neill v. Krzeminski*, 839 F.2d 9, 12 (2d Cir. 1988)). And here, as Jensen argues, the jury could have determined that Jensen's injuries were indivisible. But rather than instructing the jury to clarify whether the lump-sum amounts resulted from every claim or from specific claims, the district court ordered the jury to allocate damages among the claims. By taking this discretion away from the jury, the postverdict instruction failed to accurately state the governing law.

Third, this incomplete postverdict instruction was not neutrally phrased because it impermissibly favored West Jordan. It is evident that West Jordan stood to benefit more from allocated damages than Jensen. For example, during the bench conference that occurred immediately before the postverdict instruction, West Jordan asked the court to instruct the jury to allocate damages while Jensen asked the court to simply clarify the basis for its damages, presumably because both parties understood that allocating damages among each claim could trigger the Title VII damages cap. In light of these

9

competing interests, the court's postverdict instruction should have given the jury the choice between allocated or unallocated damages. But instead of providing a neutral instruction that permitted the jury this choice, the court improperly favored West Jordan by requiring allocation. *See Perricone*, 704 F.2d at 1378 (noting that postverdict instructions should neutrally state the law); *cf. Darks v. Mullin*, 327 F.3d 1001, 1014 (10th Cir. 2003) (noting that preverdict supplemental instructions should be "neutrally phrased").

The majority first attempts to rationalize the inaccurate and one-sided postverdict instruction by suggesting that, when considering the "entire record" and the instructions "as a whole" the jury was not misled. Maj. op. 11 (first quoting) (quoting *United States v. Sorensen*, 801 F.3d 1217, 1229 (10th Cir. 2015)), 14 (second quoting). Specifically, the majority suggests that because the preverdict instructions did not require allocation, the jury was not compelled to allocate damages, even though the postverdict instruction explicitly directed the jury to do so. *See id.* at 11–15. As an initial matter, it is not apparent to me how preverdict instructions that say nothing about allocation can cure a coercive and legally inaccurate postverdict instruction requiring the jury to allocate damages. And the majority cites no cases supporting its result. *See* Maj. op. 11–12, 14–16 (relying only on cases considering preverdict instructions). But in any event, an accurate and thorough review of the "entire record" and the instructions "as a whole" must include the *context* in which this specific postverdict instruction arose. Here, before deliberating, Jensen's counsel told the jury in closing argument *not* to allocate damages, and the written instructions received by the jury did not instruct on allocation. After deliberations,

the jury returned an unallocated damages award. Almost immediately thereafter, the court instructed the jury to reconvene and allocate damages. And after a "short recess," the jury did exactly what it was told in that final, single instruction—it returned a revised verdict that allocated damages. App. vol. 5, 1211.

Thus, contrary to the majority's characterization, even if the jury could theoretically choose not to allocate damages, the choice was just that—theoretical. In actuality, the postverdict instruction compelled the jury to allocate damages. The court told them "[w]e need you to go back and allocate," and it gave the jury no option to do otherwise. App. vol., 5, 1211. In this regard, this case presents a substantial risk that the postverdict instructions were inherently coercive, misleading the jury regarding its options for awarding damages. *See Perricone*, 704 F.2d at 1378 (determining that postverdict instruction describing impact of finding contributory negligence of plaintiff to be greater than 50 percent was inappropriate because "[i]t contains the risk that the jury may conclude that it is being told its finding of 70 percent contributory negligence was unsound"). And I note that even a lesser risk would require a remand under the majority's standard. Specifically, the majority suggests that for a postverdict instruction to be permissible, "we must be satisfied that '*the jury was [not] misled in any way*.'" Maj. op. 11 (alteration in original) (emphasis added) (quoting *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1155 (10th Cir. 2012)). Thus, the majority is incorrect to suggest that

11

a review of the entire record and the instructions as a whole permits a conclusion that the jury was not required to allocate damages.[2]

The majority also attempts to rationalize the inaccuracy and one-sidedness of the instruction by explaining that "there was a reasonable basis for dividing Jensen's injury among his claims." Maj. op. 15. But even assuming such basis exists, the majority again misses the mark. That it was possible for the jury to allocate damages does not mean that it was proper to require that the jury do so. The jury should have had the choice to award either allocated or unallocated damages. The postverdict instruction removed this choice.[3]

---

[2] The majority also implies that the jury always intended to apportion damages and that this intent is relevant to our analysis. *See* Maj. op. 13–14 (explaining that the verdict form enabled the jury to apportion damages if it wanted to). But to the extent that the majority is suggesting that the postverdict instruction was proper because the jury likely intended to award unallocated damages, the majority is misguided. The jury's intent (or rather, a reviewing court's impression of the jury's intent) has no bearing on whether the content of the postverdict instruction was impermissibly coercive. And I am not aware of any caselaw suggesting that an appellate court can affirm a legally erroneous postverdict instruction by speculating as to the jury's intent. Moreover, even if we could speculate regarding the jury's intent, it seems far more likely that the jury did *not* intend to allocate damages in its initial verdict. Rather, it appears that the jury intended to follow Jensen's counsel's suggestion that it award a single amount on each claim and put a zero in the space provided to make it clear the total damages were the same on each count. The jury could certainly have failed to understand that they needed to repeat the total damage award on each individual claim. But this disagreement regarding the jury's intent simply underscores why, given an ambiguous verdict, this court should not speculate as to the jury's intended result.

[3] It is worth noting that even if, as the majority suggests, there was a reasonable basis for allocating damages, the jury's ultimate allocation following the postverdict instruction appears unsupported. Neither Jensen nor West Jordan suggested the allocation that the jury submitted. And it is not evident why, for example, Jensen's noneconomic recovery for malicious prosecution would amount to $5,000 while the recovery for a Title VII retaliatory discharge would amount to $1.74 million when both the malicious prosecution and the retaliatory discharge led to similar injuries.

12

Because the district court issued a coercive and legally inaccurate instruction, I am left with "substantial doubt" as to whether the jury was "fairly guided." *Mullins*, 4 F.3d at 900. I would therefore reverse the jury's verdict and consider the appropriate remedy. Typically, when a jury instruction is so erroneous that we must remand the case to the district court, we order a new trial. *See United States v. Benford*, 875 F.3d 1007, 1021 (10th Cir. 2017). And cases like *Unit Drilling* and *Resolution Trust* suggest that a new trial is likewise the proper remedy for an erroneous postverdict instruction that fails to remedy an ambiguous verdict. *See Unit Drilling Co.*, 108 F.3d at 1191, 1193 (ordering new trial where district court failed to clarify ambiguous verdict); *Resolution Tr. Corp.*, 998 F.2d at 1548 (noting that ambiguous verdict is remedied by either postverdict instruction or new trial).

Notably, however, neither party requests a new trial on this issue.[4] Instead, Jensen requests that we interpret the initial verdict as properly awarding a lump-sum and reinstate that verdict whereas West Jordan argues that the latter verdict should stand. But because I would find that the initial verdict was ambiguous and the postverdict instruction failed to correct that ambiguity, I would also find that neither of the parties' suggested remedies are appropriate here. Although this situation is somewhat unique, I find guidance in our caselaw, which suggests that we can order a new trial even if the

---

[4]I note that Jensen did request that we reverse the district court's order denying him leave to amend his complaint to bring claims against Lieutenant Shober in his individual capacity. And as part of that request, Jensen asked that we order a separate trial against Shober. Additionally, in the below proceedings, West Jordan filed a motion for a new trial as to all claims; however, West Jordan does not appeal the court's order denying that motion.

parties do not request or want a new trial. *See Fischer Imaging Corp. v. Gen. Electric*, 187 F.3d 1165, 1167 (10th Cir. 1999) (ordering new trial even though plaintiff did not request new trial); *Hartnett v. Brown & Bigelow*, 394 F.2d 438, 441–42 (10th Cir. 1968) (ordering new trial to remedy inconsistent verdict and declining request to dispose of case without ordering new trial). Accordingly, I would reverse and remand for a new trial.

## II.    Attorney Fees

Although I would ultimately dispose of this appeal by ordering a new trial, I nevertheless address my disagreement with the majority's conclusion in section III.C that the district court did not abuse its discretion in reducing Hollingsworth's hourly rate. I would conclude that the court clearly erred—first by relying on reasons unsupported by the record to reject fee affidavits submitted by Hollingsworth, and second, by choosing an hourly rate that neither party suggested was in line with the prevailing rate in the community for similar services.

Consistent with the majority, I review the reasonableness of the district court's fee award for an abuse of discretion. *Robinson v. City of Edmond*, 160 F.3d 1275, 1280 (10th Cir. 1998). Under this standard, "a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Somerlott v. Cherokee Nation Distrib., Inc.*, 686 F.3d 1144, 1152 (10th Cir. 2012) (quoting *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1235 (10th Cir. 2001)). Importantly, the district court's finding can be clearly erroneous even if it has some support. *See United States v. De Jesus Cruz-Mendez*, 467 F.3d 1260, 1265 (10th

14

Cir. 2006) ("A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (quoting *United States. v. De la Cruz-Tapia,* 162 F.3d 1275, 1277 (10th Cir. 1998))).

As the district court acknowledged, reasonable rates are "in line with *those prevailing in the community for similar services* by lawyers of reasonably comparable skill, experience, and reputation." App. vol. 2, 466 (emphasis added) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)). To demonstrate that her hourly rate was reasonable, Hollingsworth submitted the declarations of Lois Baar and Christina Jepson. Both Baar and Jepson testified that Hollingsworth's hourly rate was a reasonable rate for the relevant community. But the district court summarily rejected both declarations.

The district court's rejection of Baar's declaration is contradicted by the record. When analyzing Baar's declaration, the district court accepted West Jordan's argument and disregarded Baar's testimony because she "worked primarily as a mediator in recent years and has had little opportunity to examine attorney rates." *Id.* But Baar's declaration flatly contradicts this conclusion. Baar mediates employment disputes, and she declared that her mediation practice (in addition to her more than 30 years of practice as a litigator) familiarized her with statewide rates for employment attorneys. And more specifically, she stated that she has mediated cases for Hollingsworth and is therefore familiar with her expertise and experience. Thus, the district court's rationale for rejecting Baar's declaration is contradicted by the record.

15

The district court's rejection of Jepson's declaration is equally unfounded. Jepson testified that her experience as an employment attorney, her position as the chair of her firm's employment practice, and her former position as a board member of the Labor and Employment Law Section of the Utah State Bar familiarized her with market rates. She then declared that based on that experience as well as her personal knowledge of Hollingsworth's abilities, Hollingsworth's rate is reasonable. The district court again accepted West Jordan's argument that it should give no weight to this experience. And it concluded that Jepson is not comparable to Hollingsworth because Jepson graduated first in her class, clerked for two federal judges, practices as a defense lawyer for large corporations, and works for a more expensive firm. But the district court provided no basis in law or fact for concluding that Jepson's personal achievements undermine her testimony on reasonable community rates. If anything, Jepson's credentials should strengthen her credibility on reasonable rates for the relevant community. Yet, the district court disregarded Jepson's testimony.

Rather than crediting the Baar and Jepson declarations, the district court compared Hollingsworth's rate to the rates of two attorneys who helped Hollingsworth rehearse her case to a jury focus group. One of the focus-group attorneys charged $300 per hour and the other charged $275 per hour. And together, those attorneys devoted approximately 33.5 hours to preparing for the focus group, conducting the focus group, and analyzing the result of the focus group. In its reasonable-fee analysis, the district court determined that Hollingsworth's rate should be reduced to $285 per hour, to reflect an amount between the rates of the focus-group attorneys. Although I do not suggest that such rates

16

would never provide a proper basis for awarding attorney fees, I would find that the record does not support doing so here. Specifically, the focus-group attorneys did not represent their rates as prevailing community rates or suggest that their services, which amounted to 33.5 hours of work, were similar to the extensive litigation services performed by Hollingsworth, who acted as lead counsel throughout a two-week jury trial and billed a total of 534 hours. *See Blum*, 465 at 895 n.11. And notably, the district court did not conclude or even suggest as much. Rather, the rates it relied on were simply the rates stated in the focus-group invoice. Even West Jordan failed to provide any evidence that those rates were community rates for similar services. Instead, West Jordan simply equated the skill, education, and experience of the focus-group attorneys to Hollingsworth, and the district court followed suit.

Moreover, the district court did not explain why these focus-group rates should receive more weight than the rates proposed by Baar and Jepson, who specifically testified as to prevailing community rates. Instead, the district court summarily concluded that "*[t]he court agrees with WJC that, based on the evidence provided by Mr. Jensen in this case*, a rate of $285 per billable hour is [reasonable]."App. vol 2, 467 (emphasis added).

Likewise, the majority approves the reduced rate and concludes that the focus-group attorneys were comparable to Hollingsworth in skill and experience. But simply comparing Hollingsworth to the focus-group attorneys does not satisfy *Blum*'s requirement that courts analyze reasonable rates according to comparable attorneys

17

providing similar services. *Id.*[5] And rather than confronting the evidentiary and analytical pitfalls described above, the majority attempts to bolster its conclusion by noting that the district court described Hollingsworth's conduct as "far from the epitome of professionalism." Maj. op. 20 (quoting App. vol. 2, 462). But although professionalism may be an aspect of Hollingsworth's performance that the district court could properly evaluate, the majority cites the professionalism comment out of context. The comment came in the context of the court's remarks on West Jordan's motion for a new trial, where the court specifically noted that Hollingsworth "push[ed] the limits of pre[]trial rulings" and may have "raised implications and arguments during questioning and in closing arguments." R. vol. 2, 462. Significantly, the district court did not reiterate or even allude to Hollingsworth's professionalism when analyzing Jensen's motion for attorney fees. Thus, even if professionalism is properly considered as part of the reasonable-fee analysis, the record does not support the majority's assumption that the professionalism comment underscored the district court's fee analysis.

---

[5] Even if it were proper to compare Hollingsworth to the focus-group attorneys, the majority's ultimate conclusion is illogical. The majority, adopting the rationale of the district court, explains that Hollingsworth is comparable to the focus-group attorneys because she once worked for those attorneys and because those attorneys graduated from law school in 1985 and 1995 while Hollingsworth graduated in 1996. But rather than awarding Hollingsworth a rate below that of these two attorneys, the district court chose a rate between their rates. Moreover, the district court, and, by extension, the majority, equates the attorneys' years in practice to the attorneys' experience. But an attorney's law school graduation date says little about that attorney's skill or relevant experience—yet another reason why the district court's analysis is arbitrary and unsupported.

In the absence of a new trial, I would remand the determination of Hollingsworth's fees to the district court to reconsider Hollingsworth's rate in light of the affidavits proffered by Jensen—affidavits the court rejected for reasons not supported by the record or not relevant to the court's analysis.